No. 22-7279

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

ANGEL CARTAGENA,

*Plaintiff-Appellant*,

v.

ALLIE LOVELL, ET AL.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Western District of Virginia
No. 7:21-cv-00539-RSB
Hon. Robert S. Ballou

---

## OPENING BRIEF OF PLAINTIFF-APPELLANT

---

Marisol Dominguez-Ruiz
AMERICAN CIVIL LIBERTIES UNION
39 Drumm Street
San Francisco, CA 94111
(202) 393-4930
mdominguez-ruiz@aclu.org

Jennifer Wedekind
AMERICAN CIVIL LIBERTIES UNION
915 15th Street NW
Washington, DC 20005
(202) 548-6610
jwedekind@aclu.org

*Counsel for Plaintiff-Appellant*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Fourth Circuit Local Appellate Rule 26.1, Plaintiff-Appellant Angel Cartagena states that he is an individual and not a publicly held corporation, other publicly held entity, or trade association; that he does not issue shares to the public and has no parent companies, subsidiaries, or affiliates that have issued shares to the public in the United States or abroad; that no publicly held corporation or other publicly held entity has a direct financial interest in the outcome of the litigation; and that the case does not arise out of a bankruptcy proceeding.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ............................................i

TABLE OF AUTHORITIES ........................................................v

INTRODUCTION ................................................................1

JURISDICTIONAL STATEMENT ....................................................2

STATEMENT OF ISSUES.........................................................3

STATEMENT OF THE CASE ......................................................4

I.    Statement of Facts .......................................................4

      A.    Mr. Cartagena Is Isolated In The SDTP Because Of His
            Serious Mental Illness. ..........................................4

      B.    Mr. Cartagena Is Subject To Solitary Confinement
            Conditions In The SDTP. ..........................................6

      C.    Mr. Cartagena's Mental Health Deteriorates And He
            Attempts Suicide As A Result Of The SDTP's Solitary
            Confinement Conditions. .........................................7

      D.    The Named Defendants .............................................9

II.   Proceedings Below........................................................10

STANDARD OF REVIEW.........................................................13

SUMMARY OF ARGUMENT .....................................................14

ARGUMENT .................................................................18

I.    Mr. Cartagena Adequately Alleged That Defendants Violated
      His Eighth Amendment Rights By Knowingly Isolating Him In
      Harmful Solitary Confinement Conditions. ................................. 18

      A.    Solitary Confinement Conditions Pose A Substantial Risk
            Of Serious Harm, Particularly For People With Serious
            Mental Illness......................................................................... 19

      B.    Mr. Cartagena Sufficiently Alleged That Defendants Knew
            Of The Substantial Risk Of Serious Harm That Solitary
            Confinement Conditions Posed To Him, Yet Isolated Him
            In The SDTP Regardless.......................................................... 25

II.   Mr. Cartagena Adequately Alleged That Defendants Violated
      His Due Process Rights When They Placed Him In Solitary
      Confinement Without Notice Or The Opportunity To Be Heard.. 31

      A.    Mr. Cartagena Has A Liberty Interest In Avoiding
            Solitary Confinement Conditions. ......................................... 32

            1.    VDOC Policies Give Rise To A Protected Liberty
                  Interest. ......................................................................... 32

            2.    The SDTP's Highly Isolating Conditions Are Harsh
                  And Atypical................................................................... 34

      B.    Defendants Failed To Provide Mr. Cartagena With Even
            The Most Basic Due Process Protections............................... 39

III.  Mr. Cartagena Adequately Alleged That Defendants
      Discriminated Against Him On The Basis Of His Disability
      When They Isolated Him In A Highly Restrictive Setting And
      Failed To Accommodate His Disabilities...................................... 44

      A.    Mr. Cartagena Is A Person With A Disability...................... 45

B. Mr. Cartagena Is Otherwise Qualified To Receive The Benefits Of A General Population Or Less Restrictive Setting. ...................................................................53

C. Defendants Discriminated Against Mr. Cartagena On The Basis Of Disability. ............................................................56

  1. Defendants Failed To House Mr. Cartagena In The Most Integrated Setting Appropriate To His Needs By Segregating Him In A Highly Restrictive Unit Exclusively For People With Mental Disabilities. ......57

  2. Defendants Discriminated Against Mr. Cartagena By Failing To Reasonably Accommodate His Disabilities. .................................................................62

CONCLUSION ...................................................................64

REQUEST FOR ORAL ARGUMENT....................................................64

CERTIFICATE OF COMPLIANCE.........................................................66

CERTIFICATE OF SERVICE.............................................................67

iv

# TABLE OF AUTHORITIES

## Cases

*Indiana Prot. & Advoc. Servs. Comm'n v. Comm'r, Indiana Dep't of Corr.*, No. 1:08-CV-01317-TWP, 2012 WL 6738517, (S.D. Ind. Dec. 31, 2012)...................................................................22

*Apodaca v. Raemisch*,
139 S.Ct. 5 (2018) ...........................................................................1

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......................................................................53

*Atkins v. Virginia*,
536 U.S. 304(2002) ........................................................................18

*Baird ex rel. Baird v. Rose*,
192 F.3d 462 (4th Cir. 1999) .........................................................52

*Beverati v. Smith*,
120 F.3d 500 (4th Cir. 1997) .........................................................34

*Brown v. Plata*,
563 U.S. 493 (2011) .......................................................................18

*Burnette v. Fahey*,
687 F.3d 171 (4th Cir. 2012) .........................................................31

*Clark v. Coupe*,
55 F.4th 167 (3d Cir. 2022) ...........................................................21

*Coleman v. Brown*,
28 F. Supp. 3d 1068 (E.D. Cal. 2014)............................................22

*Colon v. Howard*,
215 F.3d 227 (2d Cir. 2000)...........................................................38

*Constantine v. Rectors & Visitors of George Mason Univ.*,
    411 F.3d 474 (4th Cir. 2005) ........................................ 53, 55

*Davis v. Ayala*,
    576 U.S. 257 (2015) ............................................................ 20

*Disability Rts. Montana, Inc. v. Batista*,
    930 F.3d 1090 (9th Cir. 2019) ............................................ 22

*Erickson v. Pardus*,
    551 U.S. 89 (2007) ............................................................. 14

*Estelle v. Gamble*,
    429 U.S. 97 (1976) ....................................................... 14, 18

*Fairfax v. CBS Corporation*,
    2 F.4th 286 (4th Cir. 2021) ................................................ 13

*Farmer v. Brennan*,
    511 U.S. 825 (1994) ................................................... passim

*Fauconier v. Clarke*,
    966 F.3d 265 (4th Cir. 2020) .................................. 51, 54, 55

*Gaines v. Stenseng*,
    292 F.3d 1222 (10th Cir. 2002) .......................................... 38

*Glossip v. Gross*,
    576 U.S. 863 (2015) ............................................................ 20

*Graves v. Arpaio*,
    48 F. Supp. 3d 1318 (D. Ariz. 2014) ................................... 22

*Haines v. Kerner*,
    404 U.S. 519 (1972) ............................................................ 14

*Hamilton v. Sw. Bell Tel. Co.*,
    136 F.3d 1047 (5th Cir.1998) .................................. 13, 51, 52

vi

*Henderson v. Thomas*,
  913 F.Supp.2d 1267 (M.D. Ala. 2012) .................................................. 60

*In re Medley*,
  134 U.S. 160 (1890) ............................................................................ 20

*Incumaa v. Stirling*,
  791 F.3d 517 (2015) ................................................................. passim

*Jackson v. Carey*,
  353 F.3d 750 (9th Cir. 2003) .............................................................. 38

*Jacobs v. N.C. Admin. Office of the Courts*,
  780 F.3d 562 (4th Cir. 2015) .................................................. 47, 48, 52

*Jones 'El v. Berge*,
  164 F. Supp. 2d 1096 (W.D. Wis. 2001) ............................................. 22

*Koon v. North Carolina*,
  50 F.4th 398 (4th Cir. 2022) ............................................................... 45

*Krueger v. Angelos*,
  26 F.4th 212 (4th Cir. 2022) ......................................................... 13, 54

*Loe v. Armistead*,
  582 F.2d 1291 (4th Cir. 1978) ............................................................ 14

*Madrid v. Gomez*,
  889 F. Supp. 1146 (N.D. Cal. 1995) ................................................ 1, 22

*Magluta v. Samples*,
  375 F.3d 1269 (11th Cir. 2004) .......................................................... 38

*Marion v. Columbia Correction Inst.*,
  559 F.3d 693 (7th Cir. 2009) .............................................................. 38

*Mathews v. Eldridge,*
    424 U.S. 319 (1976) ............................................................... 39, 40, 43

*Nat'l Fed. of the Blind v. Lamone,*
    813 F.3d 494 (4th Cir. 2016) ..................................................... 45, 56, 62

*Olmstead v. L.C. ex rel. Zimring,*
    527 U.S. 581 (1999) ...................................................................... passim

*Palakovic v. Wetzel,*
    854 F.3d 209 (3d Cir. 2017) .................................................................. 22

*Pierce v. District of Columbia,*
    128 F.Supp.3d 250 (D.D.C. 2015), *reconsideration denied,*
    146 F.Supp.3d 197 (D.D.C. 2015) (Jackson, J.) ..................................... 63

*Porter v. Clarke,*
    290 F.Supp.3d 518 (E.D. Va. 2018) ...................................................... 30

*Porter v. Clarke,*
    923 F.3d 348 (4th Cir. 2019) ........................................................ passim

*Prieto v. Clarke,*
    780 F.3d 245 (2015) ............................................................. 16, 32, 34

*Reaves v. Dep't of Correction,*
    195 F. Supp. 3d 383 (D. Mass. 2016) ............................................. 60, 63

*Reyes v. Clarke,*
    No. 3:18CV611, 2019 WL 4044316 (E.D. Va. Aug. 27, 2019) .............. 49

*Rogers v. Dep't of Health & Envtl. Control,*
    174 F.3d 431 (4th Cir. 1999) .............................................................. 45

*Ruiz v. Johnson,*
    37 F. Supp. 2d 855 (S.D. Tex. 1999) .................................................... 22

*Ruiz v. United States,*
    243 F.3d 941 (5th Cir. 2001) ............................................................ 22

*Scinto v. Stansberry,*
    841 F.3d 219 (4th Cir. 2016) ..................................................... 19, 25

*Seremeth v. Bd. of Cty. Comm'rs Frederick Cty.,*
    673 F.3d 333 (4th Cir. 2012) ............................................................ 45

*Smith v. Collins,*
    964 F.3d 266 (4th Cir. 2020) .................................. 1, 35, 36, 37, 38, 39

*Stiles v. Judd,*
    No. 8:12-cv-02375-T-27EAJ, 2013 WL 6185404
    (M.D. Fla. Nov. 25, 2013) ................................................................. 60

*Summers v. Altarum Inst., Corp.,*
    740 F.3d 325 (4th Cir. 2014) ..................................................... 46, 52

*Thorpe v. Clarke,*
    37 F.4th 926 (4th Cir. 2022) ................................................... passim

*United States v. Garcia,*
    855 F.3d 615 (4th Cir. 2017) ............................................................ 29

*Wilkinson v. Austin,*
    545 U.S. 209 (2005) ............................................................... passim

*Williams v. Kincaid,*
    45 F.4th 759 (4th Cir. 2022) ..................................................... 48, 49

*Wilson v. Seiter,*
    501 U.S. 294 (1994) ........................................................................ 19

## Statutes and Regulations

28 C.F.R. § 35.108 ................................................................................ 48

28 C.F.R. § 35.130 ................................................................ 56, 57, 62

28 C.F.R. § 35.150 ................................................................ 63

28 C.F.R. § 35.152 ................................................................ 57

28 C.F.R. pt. 35, App. A (1998) ...................................... 57

28 U.S.C. § 1291 .................................................................. 3

28 U.S.C. § 1331 .................................................................. 2

29 U.S.C. § 705 .................................................................... 46

29 U.S.C. § 794 .................................................................... 44

42 U.S.C. § 12101 ............................................................... 44, 62

42 U.S.C. § 12102 ............................................................... passim

42 U.S.C. § 12131 ............................................................... 53, 55

42 U.S.C. § 12132 ............................................................... 44

42 U.S.C. § 1983 .................................................................. 3

ADA Amendments Act of 2008,
  Pub. L. No. 110-325 Sec. 4, 122 Stat. 3553 .................... 46, 47

**Rules**

Fed. R. Evid. 201 ................................................................. 29, 48

**Other Authorities**

AM. PSYCH. ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL
  DISORDERS (5th ed. text rev. 2022) ............................... 48

Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 CRIME & DELINQ. 124 (2003) ...............21

Virginia Dep't of Corr., Operating Procedure 841.4: Restorative Housing Units (2021), *available at* https://vadoc.virginia.gov/files/operating-procedures/800/vadoc-op-841-4.pdf ....................................................28

## INTRODUCTION

Angel Cartagena has a decades-long history of serious mental illness. He is currently incarcerated in the Virginia Department of Corrections, where Defendants-Appellees isolated him in solitary confinement conditions for more than eighteen months. Solitary confinement is widely known to be particularly harmful for people with serious mental illnesses. Yet Defendants stood by as Mr. Cartagena's mental health predictably deteriorated, removing him from solitary confinement only after a serious suicide attempt that required surgery and hospitalization.

Prolonged solitary confinement, and its inevitable, harmful consequences, are well-known to this Court. "Prolonged solitary confinement exacts a heavy psychological toll[.]" *Incumaa v. Stirling*, 791 F.3d 517, 534 (2015). It "imprints" a "wide range of psychological scars . . . on those that it clutches[.]" *Smith v. Collins*, 964 F.3d 266, 279 (4th Cir. 2020) (quoting *Apodaca v. Raemisch*, 139 S.Ct. 5, 9 & n.8 (2018) (Sotomayor, J., respecting denial of certiorari)). For people with serious mental illness, the harms of solitary confinement are exponentially worse. *See, e.g.*, *Madrid v. Gomez*, 889 F. Supp. 1146,

1265 (N.D. Cal. 1995) (holding that placing prisoners with serious mental illness in solitary confinement "is the mental equivalent of putting an asthmatic in a place with little air to breathe.").

Indeed, given "the extensive scholarly literature describing and quantifying the adverse mental health effects of prolonged solitary confinement[,]" the serious harm posed by solitary confinement conditions is "obvious." *Porter v. Clarke*, 923 F.3d 348, 361 (4th Cir. 2019). Nevertheless, Defendants knowingly detained Mr. Cartagena in a Secure Diversionary Treatment Program unit—a highly restrictive form of solitary confinement designed to segregate people with mental health disabilities from the general prison population. They did so without providing him any notice or opportunity to challenge the placement. And they did so not *in spite* of his serious mental illness, but *because* of it. In doing so, Defendants violated Mr. Cartagena's rights under the Eighth Amendment, the Due Process Clause, the Americans with Disabilities Act, and the Rehabilitation Act.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction in this case under 28 U.S.C. § 1331. This appeal arises from a final judgment entered on September

2

29, 2022, granting defendants' motion to dismiss an action brought under 42 U.S.C. § 1983. JA104. Mr. Cartagena timely filed a Notice of Appeal. JA105. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.      Whether the district court erred in dismissing Mr. Cartagena's Eighth Amendment claim when he sufficiently alleged that Defendants were deliberately indifferent to a substantial risk of serious harm by placing him in prolonged solitary confinement, knowing that he has a serious mental illness and that solitary confinement is particularly harmful for people with serious mental illness.

2.      Whether the district court erred in dismissing Mr. Cartagena's Due Process claim when he sufficiently alleged that Defendants deprived him of a protected liberty interest by placing him in prolonged solitary confinement without affording him the minimal procedural protections of notice and an opportunity to be heard.

3.      Whether the district court erred in dismissing Mr. Cartagena's Americans with Disabilities Act and Rehabilitation Act claims when he sufficiently alleged that he is a qualified person with a disability and that Defendants discriminated against him on the basis

3

of that disability by failing to house him in the least restrictive setting

appropriate for his needs and failing to provide him with reasonable

accommodations.

## STATEMENT OF THE CASE

### I.     Statement of Facts

#### A.     Mr. Cartagena Is Isolated In The SDTP Because Of His Serious Mental Illness.

Angel Cartagena is incarcerated in the Virginia Department of

Corrections ("VDOC"). JA63. Mr. Cartagena has a long and well-

documented history of serious mental illness. JA64–65. His diagnoses

include schizophrenia, bipolar II disorder, borderline personality

disorder, antisocial personality disorder, and schizoaffective disorder.

JA65. He has been prescribed psychotropic medications since age 12.

JA65. He has been committed multiple times to psychiatric hospitals for

treatment. JA64. And VDOC itself classifies Mr. Cartagena as someone

with a serious mental illness. JA80.

On or about November 22, 2019, Defendants transferred Mr.

Cartagena to the Secure Diversionary Treatment Program ("SDTP") at

the River North Correctional Center. JA64. He remained in this unit for

4

eighteen months and five days. JA66. Mr. Cartagena was "assigned to the program" because he "meet[s] the criteria and [is] a Seriously Mentally Ill (SMI) offender." JA49.[1]

VDOC Operating Procedure 830.5 applies to SDTP units. *See* JA81. Decisions to place someone in the SDTP are made by the Multi-Institutional Treatment Team, which includes Defendants Lovell, Dowell, Haynes, and Kilbourne. JA35, JA71. The Mental Health Clinical Supervisor and the Regional Operations Chief participate in the review process as well. JA35. To be placed in the SDTP, incarcerated people must be classified as having serious mental illness. JA35, JA40. Once that initial criterion is met, further review takes place. JA49.

Defendants did not provide Mr. Cartagena with notice or the right to appeal his confinement in the SDTP. JA80. He was not "provided the right to attend, make testimony, defend, or provide witnesses" to challenge his assignment to the unit. JA80–81. His sentence did not

---

[1] The district court considered the documents attached to Mr. Cartagena's original complaint as incorporated by reference into the amended complaint. JA87 n.2.

5

require him to be placed in a SDTP nor was it ordered by a court post-conviction. JA81.

## B.    Mr. Cartagena Is Subject To Solitary Confinement Conditions In The SDTP.

The SDTP's conditions are highly restrictive. JA66–67; JA81. People in the SDTP are locked alone in their cells for at least twenty-one hours per day. JA81, JA82. Any time incarcerated people exit their cells, they are first required to undergo a strip search. JA66. They are then placed in handcuffs and shackles, attached to a "dog leash," and escorted by two officers. JA66. They are always restrained unless inside their cells. JA66.

Outside recreation, when provided, consists of time in another segregated cage. JA66–67. When out-of-cell programming is provided, prisoners are handcuffed and shackled to tables referred to as secured chairs. JA66.

People confined in the SDTP are limited to four phone calls per month. JA66. They are not allowed to have personal property. JA66. And they are prohibited from holding a job or attending religious services. JA67.

6

By policy, everyone confined in a SDTP unit is diagnosed with a serious mental illness. JA35, JA66. People in the SDTP are not permitted to be in contact with or "anywhere near" anyone from outside the unit. JA67.

Failure to participate in mandatory SDTP programming results in sanctions. JA81. These consequences include: institutional infractions, loss or suspension of good time earnings, and stays in even more isolated cells within the SDTP. JA81. Failure to comply with SDTP programming also results in indefinite confinement within the SDTP unit. JA81–82.

### C. Mr. Cartagena's Mental Health Deteriorates And He Attempts Suicide As A Result Of The SDTP's Solitary Confinement Conditions.

The SDTP's solitary confinement conditions caused Mr. Cartagena "grievous physical injuries, emotional distress and mental anguish." JA82. The conditions caused him to lose "physical and social points of reference to ground [him] . . . into reality itself." JA66.

Mr. Cartagena alerted Defendants to his declining mental state through a series of grievances submitted between May and September 2020. *See, e.g.*, JA29, JA41, JA46, JA47, JA49. In the grievances, he

7

repeatedly told Defendants that the SDTP's restrictive conditions were causing him "severe mental anguish and emotional distress." *See, e.g.*, JA41, JA47. *See also* JA46, JA49. He repeatedly requested transfer to a less restrictive environment. *See, e.g.*, JA29, JA30, JA40, JA41, JA46, JA47, JA50, JA52, JA53, JA55, JA56. But Defendants did not remove Mr. Cartagena from the SDTP.

Mr. Cartagena continued to decompensate and ultimately attempted suicide on three different occasions. JA 67–68. In the middle of the night on April 24, 2021, Mr. Cartagena swallowed a toothpaste tube and electrical wiring in an "attempt to end his life by choking." JA67. Mr. Cartagena then deeply cut his right forearm with a razor. JA67. After cutting his arm, Mr. Cartagena cried thinking about his family and self-reported his suicide attempt to an officer. JA67. Mr. Cartagena was taken to the hospital where he refused medical treatment. JA67. Upon his return to the prison, Mr. Cartagena was placed in five-point restraints. JA67. As the night progressed, the pain in Mr. Cartagena's stomach, due to the toothpaste tube and wiring he had previously ingested, became "excruciating" and he informed a nurse. JA67. Mr. Cartagena was transferred back to the hospital, where

8

he underwent surgery to remove the objects from his stomach. JA67. The hospital did not suture his right forearm because, at that point, his wound had been "open for over 12 hours." JA67.

A few weeks later, on May 26, 2021, Defendants transferred Mr. Cartagena to Wallens Ridge State Prison, a supermax facility. JA68. Mr. Cartagena's mental health continued to suffer in the solitary confinement conditions at the supermax facility. JA68. On August 12, 2021, Mr. Cartagena attempted suicide a second time by "lacerating his right arm." JA68. A week later, August 19, 2021, Mr. Cartagena tried to take his own life once again, by cutting his arm with a razor. JA68. Mr. Cartagena received sutures on both occasions. JA68. Mr. Cartagena was then committed to the Marion Correctional Treatment Center to "receive intensive care for his serious mental health needs." JA68.

## D.   The Named Defendants

Each Defendant participated in the development, administration, or implementation of the SDTP. They authorized Mr. Cartagena's placement in solitary confinement conditions with knowledge of his serious mental illness and the risk of harm solitary confinement

9

conditions present to him. JA65, JA69–76. Each is sued in her or his official and individual capacities. JA68.

The Multi-Institutional Treatment Team, which reviewed and authorized Mr. Cartagena's placement in the SDTP, includes: Allie Lovell, SDTP director; T. Dowell, SDTP unit manager at River North Correctional Center; Mr. Kilbourne, chief of housing and programming; and Dr. Hayes, SDTP psychiatrist. JA35, JA71, JA72.

Harold Clarke, VDOC director, and David Robinson, VDOC chief of corrections operations, are responsible for developing, implementing, and enforcing policies and procedures, including those that govern the SDTP. JA74.

Eric Madsen, central classification services, oversees all transfers of incarcerated people with serious mental illness, including into the SDTP. JA73. Carl Manis, regional director for the Western Region of the Virginia Department of Corrections, oversees Allie Lovell, including Lovell's management of the SDTP program. JA70.

## II.  Proceedings Below

Mr. Cartagena brought suit *pro se* challenging the conditions of and his placement in the SDTP. *See* JA5–20 (Initial Complaint); JA62–

79 (Amended Complaint). He alleged violations of the Eighth Amendment, the Due Process Clause, the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act ("RA"), among other claims. JA62, JA68–69.[2] Mr. Cartagena sought declaratory relief, compensatory and punitive damages, an order enjoining Defendants from detaining him in an SDTP unit again, and any additional relief the court deemed just, proper, and equitable. *See* JA62, JA76.

The case was transferred to a United States Magistrate Judge, with the consent of all parties. *See* Doc. 12 (Order Transferring Case).

Defendants jointly moved to dismiss for failure to state a claim. JA84. The court granted Defendants' motion. *See* JA86. The district court held that the complaint did not sufficiently state an Eighth Amendment claim. JA95. The district court did not address whether the conditions in the SDTP posed a substantial risk of serious harm. The court ruled that Mr. Cartagena had not alleged facts "showing that any defendant knew the SDTP living conditions themselves would pose a threat to Cartagena's health or safety, or that the conditions alone could

---

[2] Mr. Cartagena also brought a religious freedom claim and a claim for inadequate mental health care. He does not pursue those claims on appeal.

11

cause, or were causing, him physical or emotional injuries." JA94. The court did not consider the leading Fourth Circuit precedent on the Eighth Amendment's application to solitary confinement conditions.

On the Due Process claim, the district court primarily discussed whether transfer to the SDTP was akin to involuntary transfer to a psychiatric hospital. JA98–100. The court held that transfer to the SDTP did not trigger a liberty interest under the law applicable to involuntary civil commitments. JA98–99.

The court also held that Mr. Cartagena had not adequately alleged that a VDOC operating procedure created a protected liberty interest because he "does not point to any VDOC procedure under which he enjoyed an 'interest or expectation' in avoiding SDTP confinement in 2019 to 2021." JA100. The court concluded that even if the SDTP conditions imposed an atypical hardship, so as to create a protected liberty interest, there were "multiple layers of review concerning an inmate's placement in the SDTP unit" and "Cartagena has not stated facts suggesting that the review processes provided are inadequate to prevent arbitrary deprivation of liberty interests." JA100–101 (internal quotation marks omitted).

12

Finally, the district court held that Mr. Cartagena had not stated a claim under the ADA or RA because he had not sufficiently alleged that he was a person with a disability. JA101–102. The court determined that "[e]vidence that the plaintiff suffers from a serious disease or mental health illness is not sufficient to show that the condition qualifies as a disability under the ADA or RA." JA101 (citing *Hamilton v. Sw. Bell Tel. Co.*, 136 F.3d 1047, 1050 (5th Cir.1998)). The court also concluded Mr. Cartagena did not sufficiently allege disability-based discrimination, stating, "I find no facts suggesting that his mental health issues motivated anyone to exclude him from any prison programming or service." JA102.

The district court entered final judgment on September 29, 2022, JA104, and Mr. Cartagena timely appealed. JA105.

## STANDARD OF REVIEW

This Court reviews *de novo* the grant of a motion to dismiss for failure to state a claim, applying the same standards as the district court. *Fairfax v. CBS Corporation*, 2 F.4th 286, 291 (4th Cir. 2021). The Court must take all well-pleaded facts as true, and draw all reasonable inferences in the plaintiff's favor. *Krueger v. Angelos*, 26 F.4th 212, 215

13

n.1 (4th Cir. 2022). Pleadings by *pro se* plaintiffs must be "liberally construed" and "a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers[.]" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). Further, "liberal construction of pleadings is particularly appropriate where, as here, there is a *Pro se* complaint raising civil rights issues." *Loe v. Armistead*, 582 F.2d 1291, 1295 (4th Cir. 1978) (italics added) (citing *Haines v. Kerner*, 404 U.S. 519, 521 (1972)).

## SUMMARY OF ARGUMENT

Solitary confinement exacts a terrible toll. For people with serious mental illness, the harm wrought by solitary confinement is even more grave. Despite knowing that Mr. Cartagena has serious mental illness, and knowing that solitary confinement causes substantial harm to those with serious mental illness, Defendants placed Mr. Cartagena in long-term solitary confinement conditions. They did so without providing him notice or an opportunity to respond. And they did so without providing him any accommodations for his mental health disability and without regard for their obligations under federal

14

disability rights laws. Confinement in these restrictive conditions predictably caused Mr. Cartagena to decompensate, ultimately leading to three suicide attempts. The district court therefore erred when it dismissed Mr. Cartagena's claims under the Eighth and Fourteenth Amendments, and the ADA and RA.

First, Mr. Cartagena adequately alleged that Defendants violated the Eighth Amendment when they placed him in objectively harmful solitary confinement conditions, with deliberate indifference to the substantial risk to his health and safety. *See Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994). This Circuit's settled law provides that solitary confinement conditions, like those described by Mr. Cartagena, objectively pose a substantial risk of serious harm and can violate the Eighth Amendment. *See Porter*, 923 F.3d at 357. Mr. Cartagena also sufficiently alleged that Defendants had knowledge of the substantial risk of serious harm and actual harm caused by solitary confinement conditions but subjected him to those conditions regardless. Mr. Cartagena repeatedly submitted grievances alerting Defendants to his deteriorating mental health while in the SDTP. And VDOC policies prohibiting the placement of prisoners with serious mental illness in

15

solitary confinement for more than 28 days demonstrate Defendants'
awareness that solitary confinement can cause serious harm. *See
Porter*, 923 F.3d at 361. Finally, the established judicial and scientific
consensus is such that the risk of harm to prisoners with serious mental
illness in solitary confinement is "obvious." *See Farmer*, 511 U.S. at 842.

Second, Mr. Cartagena adequately alleged that Defendants
violated his due process rights when they deprived him of a protected
liberty interest by placing him in harsh and atypical solitary
confinement conditions without even the most basic due process
protections. *See Prieto v. Clarke*, 780 F.3d 245, 252 (2015). As in the
Eighth Amendment analysis, it is settled law that solitary confinement
conditions like those alleged by Mr. Cartagena can implicate a protected
liberty interest. *See Wilkinson v. Austin*, 545 U.S. 209, 220 (2005);
*Incumaa*, 791 F.3d at 532. Once a liberty interest has been established,
the Court must determine the process due. Here, Mr. Cartagena
sufficiently alleged that the SDTP review process "transgresses even
the most foundational building blocks of due process[,]" *Thorpe v.
Clarke*, 37 F.4th 926, 944 (4th Cir. 2022), because Defendants failed to
provide notice or and an opportunity to be heard.

16

Finally, Mr. Cartagena sufficiently alleged that Defendants discriminated against him on the basis of his mental health disabilities, both by failing to house him in the most integrated setting appropriate for his needs and by failing to provide reasonable accommodations. Mr. Cartagena is a qualified person with a disability as a result of his serious mental illnesses, including schizophrenia, which by definition substantially limit his major life activities. Treating professionals recommended that he be housed in a less restrictive setting. Yet Defendants placed him in a highly restrictive, segregated unit for people with serious mental illness, in violation of the ADA's integration mandate. *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597 (1999). The isolating conditions in the unit were particularly harmful for Mr. Cartagena because of his disability, yet Defendants further discriminated against him when they failed to provide reasonable accommodations to mitigate the harsh conditions.

The district court therefore erred when it held that Mr. Cartagena failed to state a claim. At every turn, the district court contravened its duty to construe Mr. Cartagena's allegations liberally and failed to draw all inferences in his favor. And the court frequently failed to

17

engage in a fulsome legal analysis, at times disregarding controlling precedent or relying on out-of-circuit, out-of-date caselaw. This Court should reverse the district court's erroneous dismissal and allow Mr. Cartagena to proceed with his civil rights claims.

## ARGUMENT

### I. Mr. Cartagena Adequately Alleged That Defendants Violated His Eighth Amendment Rights By Knowingly Isolating Him In Harmful Solitary Confinement Conditions.

The Eighth Amendment prohibits "cruel and unusual punishments," U.S. CONST. amend. VIII, and requires prison officials to "provide humane conditions of confinement[.]" *Farmer*, 511 U.S. at 832. Whether conditions constitute cruel and unusual punishment "must be measured against 'the evolving standards of decency that mark the progress of a maturing society.'" *Porter*, 923 F.3d at 355 (quoting *Estelle*, 429 U.S. at 102). "The basic concept underlying the Eighth Amendment is nothing less than the dignity of man." *Brown v. Plata*, 563 U.S. 493, 510 (2011) (quoting *Atkins v. Virginia*, 536 U.S. 304, 311 (2002)).

To sufficiently plead an Eighth Amendment claim, incarcerated plaintiffs must meet two prongs. First, the "objective" prong requires plaintiffs to allege that the deprivation was "sufficiently serious." *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1994)). To be "sufficiently serious" the condition must cause a "serious or significant physical or emotional injury resulting from the challenged conditions, or a substantial risk of serious harm resulting from exposure to the challenged conditions." *Porter*, 923 F.3d at 355 (internal quotation marks, alteration, and citation omitted). Second, the "subjective" prong requires plaintiffs to allege that an official acted with "deliberate indifference"—meaning "the official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (alterations in original) (quoting *Farmer*, 511 U.S. at 837).

A.   **Solitary Confinement Conditions Pose A Substantial Risk Of Serious Harm, Particularly For People With Serious Mental Illness.**

It is settled law in this Circuit that solitary confinement conditions objectively pose a substantial risk of serious harm and can thus violate the Eighth Amendment. *Porter*, 923 F.3d at 357.

19

In *Porter*, this Court noted that "[m]ore than a century ago, the Supreme Court recognized the adverse consequences to inmates' mental health posed by prolonged detention" in solitary confinement conditions. *See* 923 F.3d at 355. Indeed, the Supreme Court observed in 1890 that solitary confinement caused a "considerable number of the prisoners [to] f[a]ll, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide[.]" *In re Medley*, 134 U.S. 160, 168 (1890).

Since that time, "advances in our understanding of psychology and new empirical methods have allowed researchers to characterize and quantify the nature and severity of the adverse psychological effects attributable to prolonged" solitary confinement. *Porter*, 923 F.3d at 355. *See also Davis v. Ayala*, 576 U.S. 257, 289 (2015) (Kennedy, J., concurring) ("[R]esearch still confirms what this Court suggested over a century ago: Years on end of near-total isolation exact a terrible price."); *Glossip v. Gross*, 576 U.S. 863, 926 (2015) (Breyer, J., dissenting) ("[I]t is well documented that such prolonged solitary confinement produces numerous deleterious harms.").

20

That research is unequivocal: solitary confinement causes serious harm. Indeed, as this Court discussed in *Porter*, "the leading survey of the literature regarding such confinement found that there is *not a single published study* of solitary or supermax-like confinement" lasting longer than 10 days "*that failed to result in negative psychological effects.*" 923 F.3d at 356 (emphasis in original; internal quotation marks omitted) (quoting Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 CRIME & DELINQ. 124, 132 (2003)). Based on this empirical evidence, *Porter* held that solitary confinement conditions "pose a 'substantial risk' of serious psychological and emotional harm." *Porter*, 923 F.3d at 357.

The objective risk of serious harm found by *Porter* is only compounded when a prisoner has a pre-existing serious mental illness. Courts across the country have uniformly held that placing a seriously mentally ill prisoner in prolonged solitary confinement presents a substantial risk of serious harm and states an Eighth Amendment claim. *See, e.g.*, *Clark v. Coupe*, 55 F.4th 167, 180 (3d Cir. 2022) (holding that seriously mentally ill plaintiff held in solitary confinement conditions stated an Eighth Amendment claim); *Disability Rts.*

21

*Montana, Inc. v. Batista*, 930 F.3d 1090, 1099 (9th Cir. 2019) (same);

*Palakovic v. Wetzel*, 854 F.3d 209, 226 (3d Cir. 2017) (same).[3]

The district court did not question the sufficiency of Mr.

Cartagena's allegations that the solitary confinement conditions he was

held in for more than eighteen months were objectively serious. Nor

---

[3] *See also Graves v. Arpaio*, 48 F. Supp. 3d 1318, 1335 (D. Ariz. 2014) ("Holding inmates with serious mental illness in prolonged isolated confinement may cause serious illness and needless suffering in violation of the Eighth Amendment.") *amended on other grounds, Graves v. Arpaio*, No. CV-77-00479-PHX-NVW, 2014 WL 6983316 (D. Ariz. Dec. 10, 2014); t*erminated on other grounds sub nom. Graves v. Penzone*, No. CV-77-00479-PHX-NVW, 2019 WL 4535543 (D. Ariz. Sept. 19, 2019); *Coleman v. Brown*, 28 F. Supp. 3d 1068, 1095, 1100 (E.D. Cal. 2014) (holding that placement of seriously mentally ill prisoners in solitary confinement "can and does cause serious psychological harm" and the Eighth Amendment prohibits placements of seriously mentally ill inmates in such conditions); *Indiana Prot. & Advoc. Servs. Comm'n v. Comm'r, Indiana Dep't of Corr.*, No. 1:08-CV-01317-TWP, 2012 WL 6738517, at *15 (S.D. Ind. Dec. 31, 2012) (finding that solitary confinement causes serious harm to prisoners with serious mental illness); *Jones 'El v. Berge*, 164 F. Supp. 2d 1096, 1117-18, 1125-26 (W.D. Wis. 2001) (holding that seriously mentally ill prisoners held in solitary confinement stated an Eighth Amendment claim and entering a preliminary injunction requiring their removal from those conditions); *Ruiz v. Johnson*, 37 F. Supp. 2d 855, 914–15 (S.D. Tex. 1999) (characterizing solitary confinement conditions as "torture" and holding the placement of seriously mentally ill prisoners in these conditions violated the Eighth Amendment), *rev'd and remanded on other grounds sub nom. Ruiz v. United States*, 243 F.3d 941 (5th Cir. 2001); *Madrid*, 889 F. Supp. at 1265–66 (holding that placing prisoners with serious mental illness in solitary confinement violates the Eighth Amendment).

could it. Mr. Cartagena alleged that he was locked alone in his cell for the vast majority of the day—at least twenty-one hours. JA81. Any time he left the cell, he was forced to submit to a strip search. JA66. He was then placed in full restraints and attached to a "dog leash" for transport. JA 66. If outdoor recreation was provided, it took place in a cage. JA66–67. He was allowed only four phone calls a month—the only opportunity for contact with anyone outside the unit. JA66. He was not allowed to engage in meaningful activities like religious services or hold a job. JA67. And any out-of-cell "programming" took place while shackled to a chair. JA66.

Living in these isolating conditions for more than eighteen months caused Mr. Cartagena substantial physical and psychological harm. JA67. He alleged that the conditions were "devastating" for him. JA66. They caused "sensory deprivation" and "lack [of] physical and social points of reference to ground [him] . . . into reality itself." JA66. As a result, his mental health deteriorated and he attempted suicide—the first of three suicide attempts resulting from his time spent in solitary confinement. JA67. It was only after Mr. Cartagena decompensated to

23

the point of attempting suicide that Defendants transferred him out of the SDTP. JA68.

This Court has held that similar conditions pose a "substantial risk of serious psychological and emotional harm" and meet the Eighth Amendment's objective standard. *See Porter*, 923 F.3d at 357 (internal quotation marks omitted). In *Porter*, like here, the plaintiffs spent the vast majority of the day alone in a small cell, without meaningful interaction with other people. *See id.* at 354. There, like here, plaintiffs' only outdoor recreation took place confined in a small cage. *See id.* at 353. There, like here, plaintiffs could not participate in congregate religious programming. *Id.* at 354. Mr. Cartagena's allegations do not include information about the lighting or cell door design, which were also conditions before the *Porter* court. But some conditions alleged by Mr. Cartagena are even more restrictive than the death row conditions previously held unconstitutional. For example, the *Porter* plaintiffs had telephone access all day, every day. *Id.* By contrast, Mr. Cartagena was permitted only four telephone calls a month, severely limiting his ability to have meaningful contact with other people. The *Porter* plaintiffs were allowed a television and compact disc player in their

24

cells, along with library materials. *Id.* Mr. Cartagena alleges strict
restrictions on personal property. Some *Porter* plaintiffs were allowed to
hold institutional jobs. *Id.* Mr. Cartagena could not. And Mr. Cartagena
was forced to submit to an invasive strip search every time he left his
cell.

In sum, at this motion to dismiss stage, Mr. Cartagena has
adequately alleged that the solitary confinement conditions in the
SDTP pose a substantial risk of serious harm.

**B.      Mr. Cartagena Sufficiently Alleged That Defendants
Knew Of The Substantial Risk Of Serious Harm That
Solitary Confinement Conditions Posed To Him, Yet
Isolated Him In The SDTP Regardless.**

The Eighth Amendment's "subjective" element requires plaintiffs
to allege that an official acted with "deliberate indifference"—meaning
"the official kn[ew] of and disregard[ed] an excessive risk to inmate
health or safety." *Scinto*, 841 F.3d at 225 (alteration in original)
(quoting *Farmer*, 511 U.S. at 835). An official's knowledge may be
demonstrated through circumstantial evidence or from "the very fact
that the risk was obvious." *Farmer*, 511 U.S. at 842.

Mr. Cartagena has a long and well-documented history of serious
mental illnesses, including schizophrenia and bipolar II disorder,

among others. JA65. VDOC mental health staff classified him as seriously mentally ill. JA80. And Defendant Kilbourne's responses to Mr. Cartagena's many grievances about conditions in the SDTP demonstrate Defendants' knowledge of Mr. Cartagena's serious mental illness: "You have been assigned to the program because you meet the criteria and are a Seriously Mentally Ill (SMI) offender[,]" JA49; "Offenders are placed in the Secure Diversionary Treatment Program because they meet the criteria for Serious Mental Illness[,]" JA35; and "These bed assignments are designated for offenders who have been classified as SMI[,]" JA40.

Mr. Cartagena's allegations also demonstrate that Defendants had notice of the significant harm he was suffering as a result of the SDTP's solitary confinement conditions. Mr. Cartagena repeatedly submitted grievances, directed at and responded to by Defendants, alerting them to his worsening mental health:

- May 17, 2020 Informal Complaint directed to the Multi-Institutional Treatment Team and responded to by Defendant Kilbourne: "The Multi-Institutional Treatment Team Knows fully well of my extensive mental health history, but failed to

26

take necessary steps to ensure the safety of my mental
stability." JA29.

- Aug. 24, 2020 Informal Complaint directed at and responded to
  by Defendant Haines: "D[ue] to the serious restrictions [the
  unit] imposes, it's putting me at high risk of emotional distress
  and serious mental anguish. . . . I [have] been i[n] this program
  now going on over 9 months and ha[ve] suffered severely."
  JA46.

- Aug. 24, 2020 Informal Complaint directed at A. Lovell and
  responded to by Defendant Kilbourne: "…the isolation and
  restrictions of the S.D.T.P. setting [are] extremely deleterious
  to my well being. I've stated to A. Lovell that I suffer severely
  from emotional distress and mental anguish[.]" JA 49. *See also*
  JA50.

- Sept. 2, 2020 Regular Grievance directed at Defendant Dowell
  and the Multi-Institutional Treatment Team: "I'm being
  subjected to so many restrictions which is causing severe
  mental anguish and emotional distress." JA41.

27

- Sept. 4, 2020 Regular Grievance directed at Defendant Haynes: "The S.D.T.P. unit imposes to[o] many restrictions and it's putting me at high risk of severe mental anguish and emotional distress." JA47.

Further, circumstantial evidence amply demonstrates that Defendants are aware of the serious harm caused by solitary confinement to people with serious mental illness. Mr. Cartagena alleged that VDOC policy itself provides that incarcerated people with serious mental illness should not be held in solitary confinement conditions for more than twenty-eight days. JA66.[4] Such policies are

---

[4] The current version of the VDOC policy referenced by Mr. Cartagena in his complaint provides, "SMI [serious mental illness] inmates must be moved out of [segregation units] within 28 days of the inmate's initial placement on general detention unless a *Serious Mental Illness (SMI) 28 Day Exemption Request* [has] been granted[.]" Virginia Dep't of Corr., Operating Procedure 841.4: Restorative Housing Units at 7 (Part (V)(D)(3)) (2021), *available at* https://vadoc.virginia.gov/files/operating-procedures/800/vadoc-op-841-4.pdf (italics in original). Mr. Cartagena respectfully requests that this Court take judicial notice of this publicly available information from a government website. *See* FED. R. EVID. 201(c)(2) ("The court . . . must take judicial notice if a party requests it and the court is supplied with the necessary information."). The Court may judicially notice at any point during the proceeding a fact that is not subject to reasonable dispute when it is either (1) generally known within the district court's jurisdiction, or (2) can be readily determined from an indisputably

28

"unrebutted evidence of State Defendants' awareness that extended stays in segregation can have harmful emotional and psychological effects." *Porter*, 923 F.3d at 361 (internal quotation marks omitted). Indeed, this Court has repeatedly found that VDOC officials are well aware that solitary confinement conditions pose a substantial risk of serious harm. *See, e.g.*, *id.* at 361 (determining that Defendant Clarke was aware of the substantial risk of serious harm posed by solitary confinement); *Thorpe*, 37 F.4th at 935 (concluding it is "more than plausible" that VDOC officials—including Defendants Clarke, Robinson, and Manis; wardens; officers responsible for prison operations; and mental health professionals—were aware of the harm and risk of harm caused by solitary confinement).

Further, the established scientific and judicial consensus is such that the risk of harm to prisoners with serious mental illness in solitary confinement is "obvious." *See Farmer*, 511 U.S. at 842. Binding circuit precedent provides that "the extensive scholarly literature describing and quantifying the adverse mental health effects of prolonged solitary

---

accurate source, such as a government website. FED. R. EVID. 201(b)(2), (d); *United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017).

29

confinement that has emerged in recent years provides circumstantial evidence that the risk of such harm was so obvious that it had to have been known." *Porter*, 923 F.3d at 361 (internal quotation marks and citation omitted). Given Defendants' "status as corrections professionals, it would defy logic to suggest that they were unaware of the potential harm" caused by solitary confinement conditions. *Id.* (quoting *Porter v. Clarke*, 290 F.Supp.3d 518, 532 (E.D. Va. 2018)).

The district court acknowledged that Dr. Haynes and "other defendants are likely aware that Cartagena has been diagnosed with SMI[.]" JA95. But the district court determined that Mr. Cartagena did not allege sufficient facts "showing that any defendant knew the SDTP living conditions themselves would pose a threat to Cartagena's health or safety, or that the conditions alone could cause, or were causing him physical or emotional injuries." JA94.[5] In doing so, the district court

---

[5] The district court implied that because the SDTP unit "is designed for inmates like [Cartagena], who have been diagnosed with SMI[,]" JA94, that somehow negates the harmfulness of the conditions and/or Defendants' culpability. To the contrary, it shows that Defendants knowingly placed Mr. Cartagena and other incarcerated people with serious mental illness into conditions known to seriously exacerbate existing mental illnesses and cause new psychological and physical harm.

disregarded the many facts contained in Mr. Cartagena's complaint, discussed above, demonstrating Defendants' knowledge of the risk of harm and actual harm caused by the SDTP's conditions. The district court also failed to consider the "obviousness" of the risk and this Court's precedent. Taken together, Mr. Cartagena's allegations are more than sufficient to allege that Defendants had a sufficiently culpable state of mind. *See Thorpe*, 37 F.4th at 936 (holding similar allegations sufficient at the motion to dismiss stage).

## II. Mr. Cartagena Adequately Alleged That Defendants Violated His Due Process Rights When They Placed Him In Solitary Confinement Without Notice Or The Opportunity To Be Heard.

The Fourteenth Amendment's Due Process Clause guards against unlawful deprivations of life, liberty, or property. U.S. CONST. amend. XIV, § 1. To adequately allege a Due Process violation for placement in solitary confinement, plaintiffs must sufficiently allege two prongs: First, that they have a protected liberty interest, and second, that the state failed to afford them minimum procedural protections. *Burnette v. Fahey*, 687 F.3d 171, 180–81 (4th Cir. 2012).

### A.   Mr. Cartagena Has A Liberty Interest In Avoiding Solitary Confinement Conditions.

Black-letter law provides that solitary confinement conditions can implicate a protected liberty interest. *See Wilkinson*, 545 U.S. at 220 (holding that prisoners had a protected liberty interest in avoiding assignment to supermax facility with solitary confinement conditions); *Incumaa*, 791 F.3d at 532 (holding that plaintiff demonstrated a liberty interest in avoiding solitary confinement conditions). To establish a liberty interest, a plaintiff must (1) "point to a Virginia law or policy providing him with an expectation of avoiding the conditions of his confinement," and (2) "demonstrate that those conditions are harsh and atypical in relation to the ordinary incidents of prison life." *Prieto*, 780 F.3d at 252.

### 1.   VDOC Policies Give Rise To A Protected Liberty Interest.

Time and again, this Court has had "no trouble" concluding the first prong is met when plaintiffs are confined to solitary confinement units governed by VDOC policies or regulations that mandate review. *Incumaa*, 791 F.3d at 527. *See also Thorpe*, 37 F.4th at 942.

32

Here, as in *Incumaa* and *Thorpe*, Mr. Cartagena alleged that he was placed in the SDTP based on VDOC policy and procedure. Mr. Cartagena alleged that VDOC Operating Procedure 830.5 applies to SDTP units. *See* JA81. He also alleged that the Multi-Institutional Treatment Team, which includes Defendants Lovell, Dowell, Haynes, and Kilbourne, conducts a review before admission. *See* JA71. *See also* JA35 ("There are multiple levels of review concerning this placement. The Mental Health Clinical Supervisor as well as the Regional Operations Chief participate with extensive external review by a Multi-Institutional Treatment Team."); JA49 ("The process of being assigned to the Diversionary Treatment Program is a Multi-Institutional Treatment Team decision. Once criteria for SMI are met, the offender is further reviewed[.]").

In addition, Mr. Cartagena alleged that VDOC policy provides that incarcerated people with serious mental illness shall not be held in solitary confinement units for more than 28 days. JA66. This policy, too, "provid[es] him with an expectation of avoiding the conditions of his confinement[.]" *Prieto*, 780 F.3d at 252.

The district court overlooked these allegations, stating that Mr. Cartagena did "not point to any VDOC procedure under which he enjoyed an 'interest or expectation' in avoiding SDTP confinement in 2019 to 2021." JA100. This was error. Construing Mr. Cartagena's pro se complaint liberally, as the Court must at this motion to dismiss stage, Mr. Cartagena adequately identified the VDOC policies that give rise to a protected liberty interest.

> ### 2.    The SDTP's Highly Isolating Conditions Are Harsh And Atypical.

This Court has held repeatedly that conditions akin to those in the SDTP are "harsh and atypical in relation to the ordinary incidents of prison life." *See, e.g.*, *Thorpe*, 37 F.4th at 942; *Incumaa*, 791 F.3d at 531–32. "Whether confinement conditions are atypical and substantially harsh 'in relation to the ordinary incidents of prison life' is a 'necessarily . . . fact specific' comparative exercise." *Incumaa*, 791 F.3d at 527 (alteration in original) (quoting *Beverati v. Smith*, 120 F.3d 500, 502–03 (4th Cir. 1997)). General population conditions are the "baseline" for comparison in cases, like here, where the plaintiff was "sentenced to confinement in the general prison population" and later transferred to a more restrictive setting. *Incumaa*, 791 F.3d at 527.

34

This Court considers three factors when determining whether conditions are harsh and atypical: (1) the magnitude of confinement restrictions; (2) whether the segregation is indefinite; and (3) whether the segregation has any collateral consequences on the prisoner's sentence. *See Incumaa*, 791 F.3d at 530. The first factor, however, has carried the most weight. *See, e.g.*, *Thorpe*, 37 F.4th at 942 (focusing analysis primarily on the severity of the conditions); *Smith v. Collins*, 964 F.3d 266, 269 (4th Cir. 2020) (noting as to the second factor: "prisoners need not languish in solitary confinement for decades . . . to possess a cognizable liberty interest"); *Incumaa*, 791 F.3d at 532 (finding that the solitary confinement at issue did not implicate the third factor at all but nevertheless holding that the conditions gave rise to a liberty interest). Here, each factor is met.

First, Mr. Cartagena has sufficiently alleged that the SDTP's conditions are highly restrictive and isolating, like those previously held by this Court to be "harsh and atypical" and unlike those in general population.

In *Thorpe*, this Court had "no doubt" that conditions in Virginia's supermax facilities were sufficiently harsh and atypical to create a

35

protected liberty interest. 37 F.4th at 942. There, plaintiffs alleged they were confined to their cells twenty-two hours a day. *Id.* at 931. They were allowed only one hour of exercise per day in a small cage. *Id.* They were denied all productive activities, with the exception of a workbook program. *Id.* They were allowed only one hour of non-contact visitation per week. *Id.* And they were required to submit to a strip search each time they left their cells. *Id. See also Smith*, 964 F.3d at 272-73 (examining similar conditions and finding a protected liberty interest).

Similarly, in *Incumaa*, this Court found a protected liberty interest when the plaintiff alleged being locked down in his cell for the vast majority of his time; an inability to socialize with other incarcerated people; the denial of educational, vocational, and therapy programs; and near-daily strip searches. 791 F.3d at 531.

Notably, this Court has been particularly concerned with solitary confinement conditions that include a highly intrusive strip search every time prisoners leave their cells, finding this practice renders conditions even "worse" than those held to give rise to a liberty interest by the Supreme Court in *Wilkinson. See Incumaa*, 791 F.3d at 531; *Smith*, 964 F.3d at 276.

36

The conditions alleged by Mr. Cartagena are akin to those in *Thorpe* and *Incumaa*. Recall that Mr. Cartagena was locked down, alone in a cell, the vast majority of the day. Outdoor recreation, when provided, took place in a cage. Participation in meaningful activities like religious programming or vocational opportunities was prohibited. Contact with the outside world was restricted to four phone calls a month. Contact with prisoners outside his unit was prohibited. Personal property was banned. And any time Mr. Cartagena left the confines of his solitary cell, he was subject to an invasive strip search and full restraints. JA66–67.

Second, Mr. Cartagena alleged he was confined in the SDTP for eighteen months and five days—or more than 550 days—and that his confinement could have been indefinite. JA64; JA66; JA82. Indeed, he was removed from the unit only after his mental health so severely deteriorated that he attempted suicide. JA 67–68. Courts consider the duration of confinement, as well as indefiniteness, when determining whether solitary confinement conditions give rise to a liberty interest. *See Smith*, 964 F.3d at 277. And this Court's sister circuits have held that durations significantly less than 550 days are sufficiently harsh

37

and atypical to state a claim under the Due Process Clause. *See, e.g.*, *Marion v. Columbia Correction Inst.*, 559 F.3d 693, 698 (7th Cir. 2009) (holding that allegations of 240 days in solitary confinement stated a due process claim); *Magluta v. Samples*, 375 F.3d 1269, 1282 (11th Cir. 2004) (holding that more than 500 days in solitary confinement was an atypical and significant hardship); *Jackson v. Carey*, 353 F.3d 750, 757 (9th Cir. 2003) (holding that allegations of five months in administrative segregation were sufficient to state a due process claim); *Gaines v. Stenseng*, 292 F.3d 1222, 1225–26 (10th Cir. 2002) (reversing sua sponte dismissal where plaintiff alleged 75 days in disciplinary segregation); *Colon v. Howard*, 215 F.3d 227, 231–32 (2d Cir. 2000) (holding that 305 days in solitary confinement gave rise to a due process liberty interest).

Third, Mr. Cartagena alleged that his confinement in the SDTP could affect his ability to accrue good time credit. JA81 (noting the potential for being "penalized and suspended of good time earnings"). The inability to earn good-time credits is a collateral consequence on a prisoner's sentence sufficient to meet this third factor. *Smith*, 964 F.3d at 280. This factor need not be met at all, however, for conditions to give

rise to a liberty interest. *Incumaa*, 791 at 532 (holding conditions created a liberty interest even though they did not affect plaintiff's parole eligibility).

The district court glossed over the conditions alleged by Mr. Cartagena and instead focused on whether the process provided was sufficient. JA100. A comprehensive review of Mr. Cartagena's allegations, and drawing all inferences in his favor, demonstrates that he sufficiently alleged that the SDTP's conditions are "harsh and atypical."

**B.     Defendants Failed To Provide Mr. Cartagena With Even The Most Basic Due Process Protections.**

Once a liberty interest has been established, the Court must consider what process is due to an incarcerated person in solitary confinement. The Supreme Court has "declined to establish rigid rules" and instead has "embraced" the three-pronged framework established in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *Wilkinson*, 545 U.S. at 224. As such, neither the Supreme Court nor this Court has articulated "the exact process" prisoners must receive. *Thorpe*, 37 F.4th at 944. Nevertheless, it is clear that officials must provide, at a minimum,

39

"notice of the case against him and opportunity to meet it." *Id.* at 944–45 (quoting *Mathews*, 424 U.S. at 348).

The *Mathews* framework includes three factors: (1) the private interest that will be affected; (2) the risk of erroneous deprivation and the probable value of additional procedural safeguards; and (3) the government's interest, including the fiscal or administrative burden that additional process may entail. *See Wilkinson*, 545 U.S. at 224–25 (citing *Mathews*, 424 U.S. at 335). Here, Mr. Cartagena alleged that the SDTP review process "transgresses even the most foundational building blocks of due process: notice . . . and an opportunity to be heard." *Thorpe*, 37 F.4th at 944. Mr. Cartagena alleged that SDTP placements are determined by the Multi-Institutional Treatment Team. He alleged, however, that he was not provided with any notice of the factual basis for his contemplated placement, or with the right to attend a hearing, provide testimony, call witnesses, or rebut those factual allegations in any way. JA64. Applying the three *Mathews* factors, Mr. Cartagena's allegations sufficiently allege Defendants failed to provide adequate process.

40

First, Mr. Cartagena's private interest stems from his prolonged solitary confinement, which "exacts a heavy psychological toll that often continues to plague an inmate's mind even after he is resocialized." *Incumaa*, 791 F.3d at 534. This interest is heightened because "every aspect of [his] life is severely restricted and his body is subjected to extraordinary intrusion on a regular basis." *Id.* Thus, even when evaluated "within the context of the prison system and its attendant curtailment of liberties[,]" *Wilkinson*, 545 U.S. at 225, this interest is "significant." *See Incumaa*, 791 F.3d at 534.

Second, the risk of erroneous deprivation here is high. In *Incumaa*, the process provided was held insufficient when there was only a single-layered review, the plaintiff was not provided notice of the factual basis for a decision, and the plaintiff was not allowed to contest the factual bases for the decision. 791 F.3d at 534–35. By contrast, the Supreme Court in *Wilkinson* deemed the process sufficient where there were multiple levels of review, and prisoners "receive[d] notice of the factual basis leading to consideration for [solitary confinement] and a fair opportunity for rebuttal." 545 U.S. 209 at 225–26.

41

The lack of process provided to Mr. Cartagena aligns much more closely with the facts in *Incumaa* than *Wilkinson*. Indeed, the failure by Defendants to provide a factual reason for their decision or any opportunity to contest it encourages "arbitrary decisionmaking" and risks the possibility of "erroneous deprivation." *Incumaa*, 791 F.3d at 534.

Third, courts generally have presumed that the government's interest arises from the need "to maintain order and security." *Incumaa*, 791 F.3d at 535. *See also Wilkinson*, 545 U.S. at 227 (discussing state's interest in prison security). *Wilkinson* evaluated placement in a supermax facility "designed to segregate the most dangerous prisoners from the general population[,]" 545 U.S. at 213, while *Incumaa* considered a prisoner who "organized a prison riot" and was placed in solitary confinement "to maintain and control the inmate and to provide safety and security for the staff and other inmates." 791 F.3d at 520–21 (quotation marks omitted). Even given those security concerns, "the prison's interest does not eclipse Appellant's well-established right to receive notice of the grounds for his ongoing confinement and to present his rebuttal to those grounds." *Incumaa*,

42

791 F.3d at 535. And here, unlike the plaintiffs in *Incumaa* and *Wilkinson*, the primary reason for Mr. Cartagena's placement in the SDTP was not for safety and security but because of his serious mental illness. *See, e.g.*, JA49 ("You have been assigned to the program because you meet the criteria and are a Seriously Mentally Ill (SMI) offender."). As such, the state's interest in security carries even less weight here.

The district court determined that because there appears to be "multiple levels of review" regarding placement in the SDTP, any due process requirements are met. JA100. But this conclusion misses the mark. The number of layers of review is only one aspect this Court considers when determining the risk of erroneous deprivation. *See Incumaa*, 791 F.3d at 534–35. And the other factors—notice and an opportunity to respond—are weighty. Indeed, they are the bedrock principles underlying due process. "Absent these elementary requirements, established long ago, prisoners simply do not have 'a meaningful opportunity to present their case.'" *Thorpe*, 37 F.4th at 945 (quoting *Mathews*, 424 U.S. at 349). *See also Wilkinson*, 545 U.S at 226 (holding that notice and an opportunity for rebuttal "are among the

43

most important procedural mechanisms for purposes of avoiding erroneous deprivations.").

Construing Mr. Cartagena's allegations liberally at this motion to dismiss stage, he has adequately alleged that Defendants failed to provide him with even the most minimal due process protections.

**III.    Mr. Cartagena Adequately Alleged That Defendants Discriminated Against Him On The Basis Of His Disability When They Isolated Him In A Highly Restrictive Setting And Failed To Accommodate His Disabilities.**

The ADA and the RA prohibit disability-based discrimination. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. *See also* 29 U.S.C. § 794(a) (applying similar prohibitions to programs or activities receiving federal funds). Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).

To state an ADA or RA claim, plaintiffs must allege that they: (1) have a disability; (2) are otherwise qualified to receive the benefits of a

44

public service, program, or activity; and (3) were denied the benefits of

the service, program or activity, or otherwise discriminated against, on

the basis of their disability. *Nat'l Fed. of the Blind v. Lamone*, 813 F.3d

494, 502–03 (4th Cir. 2016); *Koon v. North Carolina*, 50 F.4th 398, 405

(4th Cir. 2022).[6] Mr. Cartagena sufficiently pleaded all three elements,

and the district court erred in dismissing his claims.[7]

### A.    Mr. Cartagena Is A Person With A Disability.

The ADA and RA "share the same definitions of disability." *Rogers

v. Dep't of Health & Envtl. Control*, 174 F.3d 431, 433 (4th Cir. 1999).

Both statutes define "disability" as: (1) a physical or mental impairment

that substantially limits one or more major life activities; (2) a record of

the impairment; or (3) being regarded as having such an impairment.

42 U.S.C. § 12102(1); 29 U.S.C. § 705(20)(B). Mr. Cartagena only needs

---

[6] "Claims under the ADA's Title II and the Rehabilitation Act can be combined for analytical purposes because the analysis is substantially the same." *Seremeth v. Bd. of Cty. Comm'rs Frederick Cty.*, 673 F.3d 333, 336 n.1 (4th Cir. 2012) (internal quotation marks omitted).

[7] Notably, Defendants assumed for the purpose of their motion to dismiss that Mr. Cartagena "is a qualified individual with a disability and that his placement in the SDTP unit constituted an exclusion or denial of benefits[.]" Doc. 17 at 18. Defendants disputed only that Mr. Cartagena was discriminated against on the basis of his disability. *Id.*

to meet one of these categories to sufficiently plead he is a person with a disability.

The ADA Amendments Act of 2008 ("ADAAA") broadened the definition of "disability" to expand the ADA's coverage. *See* 42 U.S.C. § 12102 (instructing that the definition of "disability" must be "construed in favor of broad coverage . . . to the maximum extent permitted" under the statute); ADA Amendments Act of 2008, Pub. L. No. 110-325 Sec. 4, 122 Stat. 3553. Under the ADAAA, an impairment constitutes a disability even if it (1) only substantially limits one major life activity; or (2) is episodic or in remission, if it would substantially limit at least one major life activity if active. ADA Amendments Act of 2008, Pub. L. No. 110-325 Sec. 3, 122 Stat. 3553, 3556.

Congress passed the ADAAA in response to a series of Supreme Court decisions applying a narrow interpretation of "disability," thereby limiting the ADA's coverage. *Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 329 (4th Cir. 2014). The ADAAA "clarifies that [t]he primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the

46

definition of disability." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 572 (4th Cir. 2015) (internal quotation marks and citation omitted). Indeed, "[t]he question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." *Id.* (quoting ADA Amendments Act of 2008, Pub. L. No. 110-325, Sec. 2, 122 Stat. 3553).

Under the ADAAA's broad approach, Mr. Cartagena's allegations satisfy all three definitions of disability provided by 42 U.S.C. § 12102(1). First, Mr. Cartagena has a "physical *or mental* impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A) (emphasis added). "Major life activities" include eating, sleeping, speaking, learning, reading, concentrating, thinking, communicating, and working, among others. 42 U.S.C. § 12102(2)(A). Mr. Cartagena has serious mental illnesses, including: schizophrenia, bipolar II disorder, borderline personality disorder, antisocial personality disorder, and schizoaffective disorder. JA65. To take just one, schizophrenia is characterized by delusions, hallucinations, disorganized speech, disorganized behavior and "negative symptoms." *See* AM. PSYCH. ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF

47

MENTAL DISORDERS 114-15 (5th ed. text rev. 2022) ("DSM-V").[8]

Schizophrenia is also associated with inappropriate affect; depression, anxiety, or anger; disturbed sleep pattern; and a lack of interest in eating or food refusal. *Id.* at 116. Further, "[c]ognitive deficits in schizophrenia are common and strongly linked to vocational and functional impairments." *Id.* Schizophrenia therefore undoubtedly, and often profoundly, "substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). *See also* 28 C.F.R. §§ 35.108(d)(2)(ii), (iii)(K) (noting that "some types of impairments will, in virtually all cases," qualify as an impairment that substantially limits one or more major life activity, and "it should be easily concluded that . . . schizophrenia . . . substantially limits brain function.").

This Court has embraced the ADAAA's broad directives in cases where the plaintiff's disability stems from a diagnosed mental illness.

---

[8] The Court has taken judicial notice of, and regularly relied on, the DSM as part of its ADA analysis. *See, e.g.*, *Williams v. Kincaid*, 45 F.4th 759, 767 n.2 (4th Cir. 2022) ("Like a dictionary, the DSM-5 represents a useful source as to the meaning of a statutory term. Courts do not require plaintiffs to attach dictionaries to their complaints in order for courts to consider them."); *Jacobs*, 780 F.3d at 565 & n.2 (taking judicial notice of the DSM-IV and relying on its definitions). Mr. Cartagena respectfully requests that this Court take judicial notice of the information contained in the DSM-V. *See* FED. R. EVID. 201(c)(2).

*See Williams*, 45 F.4th at 770 ("[W]e are once again guided by Congress'
mandate that we must construe the definition of 'disability' as broadly
as the text of the ADA permits."). And courts in this Circuit have
applied these broad principles to prisoners with serious mental illness
in solitary confinement alleging ADA violations. *See Reyes v. Clarke*,
No. 3:18CV611, 2019 WL 4044316, at *23 (E.D. Va. Aug. 27, 2019).

In *Reyes*, the plaintiff alleged he had "serious mental illness,
including severe depression, which interferes with his ability to care for
himself, concentrate, think, and communicate," and that his condition
"necessitated psychotropic medication." *Id*. at *9, *23 (citation omitted).
The plaintiff therefore "pled sufficient facts to satisfy the first element
of his ADA claim." *Id*. Like *Reyes*, Mr. Cartagena alleged he suffers from
a serious mental illness defined by major functional and cognitive
impairments and that he is prescribed psychotropic medicine due to his
diagnosis. JA65. Like *Reyes*, therefore, Mr. Cartagena has pleaded
"sufficient facts to establish the first element of his ADA claim." *See
Reyes*, 2019 WL 4044316, at *23.

Second, Mr. Cartagena adequately alleged a "record of" his
disability. *See* 42 U.S.C. § 12102(1)(B). Mr. Cartagena's diagnoses have

been medically documented since age 12 and throughout his incarceration. JA 64; JA65–66. Indeed, VDOC has classified him as seriously mentally ill. *See* JA80; *see also* JA49.

Third, Mr. Cartagena sufficiently alleged he is "regarded as having such an impairment." 42 U.S.C. § 12102(1)(C). The "regarded-as" prong is satisfied "if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment *whether or not the impairment limits* or is perceived to limit a major life activity." 42 USCA § 12102(3)(A) (emphasis added).

Mr. Cartagena alleged he was subject to disability-based discrimination when VDOC sent him to solitary confinement because of his disability. JA64; JA66; JA80. Indeed, Defendants' own documentation acknowledges that Mr. Cartagena was placed in the SDTP because of his perceived mental disability. JA49 ("You have been assigned to the program because you meet the criteria and are a Seriously Mentally Ill (SMI) offender."). Such documentation is sufficient at this stage to plausibly allege that Defendants "regarded" Mr. Cartagena as having a disability when they isolated him in the

50

SDTP. *See Fauconier v. Clarke*, 966 F.3d 265, 277 (4th Cir. 2020) (holding plaintiff adequately pleaded first element of ADA claim by attaching prison records showing officials denied plaintiff a job because of his medical condition).

The district court therefore erred when it held that Mr. Cartagena failed to adequately plead he was a person with a disability. The lower court held that evidence of a mental illness was "not sufficient" to demonstrate a disability, and that Mr. Cartagena failed to state enough facts to show that "his mental illnesses impair his major life activities so as to meet the required definition of disability." JA102. In so holding, the court applied the inappropriately narrow approach expressly rejected by Congress when it passed the ADAAA and contravened this Court's precedent.

The district court relied on *Hamilton v. Sw. Bell Tel. Co.*, 136 F.3d 1047, 1050 (5th Cir.1998), a nonbinding case that is no longer good law.[9] *Hamilton* applied an outdated, narrow definition of disability when it held that the plaintiff's short-term disability did not meet the

---

[9] "In enacting the ADAAA, Congress abrogated earlier inconsistent caselaw." *Jacobs*, 780 F.3d at 572.

ADA's requirements. *Id.* at 1051. *Hamilton*, and the decision below, exemplifies what Congress sought to change: an overly narrow interpretation of the ADA that excluded many people with disabilities from the protections of the statute. *See Summers*, 740 F.3d at 330 (discussing that Congress passed the ADAAA "to liberalize the ADA in favor of broad coverage" because "courts had construed the term 'disability' too narrowly"). And it stands in stark contrast to more recent, binding precedent holding that short-term disabilities are qualifying disabilities under the ADA. *See id.* at 331-33 (holding that plaintiff sufficiently alleged an ADA claim even though his injury lasted only seven months and was categorized as a short-term and temporary).

Further, binding precedent from this Court, even before the ADAAA, held that plaintiffs alleging serious mental illness state a claim under the ADA. *See, e.g.*, *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 467 & n.3 (4th Cir. 1999) ("[W]e agree that Baird's allegations concerning her depression are adequate to state a claim as to [the first ADA] element.").

52

Under the ADAAA's broad mandate and binding caselaw, Mr. Cartagena sufficiently pleaded facts to satisfy the first element of an ADA and RA claim.

### B. Mr. Cartagena Is Otherwise Qualified To Receive The Benefits Of A General Population Or Less Restrictive Setting.

Under the second prong of an ADA and RA claim, a plaintiff is "qualified" if he or she is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). *See also Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005).

Here, Mr. Cartagena sufficiently alleged that he was otherwise qualified to remain in general population or another less restrictive setting. He alleged he was not sentenced to a specialized unit or an otherwise restrictive setting. JA81. He alleged that "treating professionals recommended treatment in a less restrictive setting."[10]

---

[10] The district court refused to consider this allegation because Mr. Cartagena did not "provide evidence of these purported recommendations, who made them, or under what circumstances."

53

JA75. And the complaint contains no facts indicating he was removed from the general population and assigned to the SDTP for any reason other than his disability. *See, e.g.*, JA49 ("You have been assigned to the program because you meet the criteria and are a Seriously Mentally Ill (SMI) offender."); JA52 ("These bed assignments are designated for offenders who have been classified as SMI.").

A plaintiff is otherwise qualified when a disability is the only reason for denying participation in a service, program, or activity. *See Fauconier*, 966 F.3d at 277. In *Fauconier*, the plaintiff was denied participation in a prison work program due to his medical classification even though he was able to perform the tasks for his job. There, the plaintiff plausibly alleged he was otherwise qualified based on the satisfactory performance reviews he received despite his ongoing

---

JA95. This was error. Mr. Cartagena is not required to provide evidence or "detailed factual allegations" in his complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Further, as Mr. Cartagena is incarcerated, the evidence the district court sought is solely in the control of the Defendants at this early stage in the litigation. Consideration of a motion to dismiss is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. The district court erred when it failed to apply this common sense and binding precedent, and failed to liberally construe Mr. Cartagena's allegations, drawing all reasonable inferences in his favor. *See Krueger*, 26 F.4th at 215 n.1.

54

medical condition. *Id.* at 277. Like *Fauconier*, here Defendants relied

only on Mr. Cartagena's serious mental illness classification to send

him to the SDTP and deny him the benefits of general population or a

less restrictive setting. JA49; JA75. And just as the plaintiff in

*Fauconier* had long lived with his medical condition and satisfactorily

performed his prison job, 966 F.3d at 277, Mr. Cartagena's mental

health classification has long been known to Defendants, and he had

been housed elsewhere previously.

Further, plaintiffs remain "otherwise qualified" even when they

require accommodations to meet essential eligibility requirements. *See*

42 U.S.C. § 12131(2). *See also Constantine*, 411 F.3d at 499 (holding

that plaintiff met essential eligibility requirements when she could

"perform all the essential functions of being a student with reasonable

accommodations"). Mr. Cartagena may ultimately require reasonable

accommodations, such as assistance with medication compliance, to

facilitate his stay in a less restrictive setting. JA65 (noting he has been

prescribed psychotropic medications since age 12). But at this motion to

dismiss stage, and drawing all reasonable inferences in Mr. Cartagena's

55

favor, Mr. Cartagena sufficiently alleged he was otherwise qualified to receive the benefits of a less restrictive setting.

### C.  Defendants Discriminated Against Mr. Cartagena On The Basis Of Disability.

Defendants discriminated against Mr. Cartagena on the basis of his disability when they isolated him in the SDTP and denied him the benefits of a less restrictive setting, such as opportunities to interact with his non-disabled peers, participate congregate religious programming, apply for a job, or participate in other meaningful activities. First, the unjustified segregation of people with disabilities is a prohibited form of disability-based discrimination. *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597 (1999). Mr. Cartagena sufficiently alleged Defendants segregated him from nondisabled peers in violation of the ADA and RA by placing him in the SDTP—a unit that exclusively houses people with mental health disabilities. Second, Defendant's failure to accommodate Mr. Cartagena's mental health disability by modifying the restrictive conditions separately constitutes disability-based discrimination. *See* 28 C.F.R. § 35.130(b)(7). *See also Nat'l Fed. of the Blind*, 813 F.3d at 510 (concluding the ADA and the RA "require

56

even well-intentioned public entities to make certain reasonable

accommodations.").

### 1. Defendants Failed To House Mr. Cartagena In The Most Integrated Setting Appropriate To His Needs By Segregating Him In A Highly Restrictive Unit Exclusively For People With Mental Disabilities.

Public entities must "administer services, programs, and activities

in the *most integrated setting* appropriate to the needs of qualified

individuals with disabilities." *Olmstead*, 527 U.S. at 592 (quoting 28

C.F.R. § 35.130(d)) (emphasis added). The most integrated setting is one

"that enables individuals with disabilities to interact with non-disabled

persons to the fullest extent possible." 28 C.F.R. pt. 35, App. A, p. 450

(1998). The ADA's implementing regulations applicable to prison and

jail administration reiterate the statute's "integration mandate":

"Public entities shall ensure that inmates or detainees with disabilities

are housed in the most integrated setting appropriate to the needs of

the individuals." 28 C.F.R. § 35.152(b)(2). These implementing

regulations, promulgated at the direction of Congress, "warrant

respect." *Olmstead*, 527 U.S. at 598.

The Supreme Court's landmark ruling in *Olmstead* held that the unjust segregation of people with disabilities was prohibited discrimination, and that people with disabilities were entitled to receive "community-based treatment[,]" or services in the most integrated setting possible based on an individualized assessment. *Olmstead*, 527 U.S. at 597, 600, 605, 607. The Court's holding that segregating people with disabilities constitutes disability-based discrimination "reflect[ed] two evident judgments." *Id.* at 600. First, unjustly segregating people with disabilities "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life." *Id.* Second, segregation "severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id.* at 601.

*Olmstead* addressed the institutionalization of people with disabilities in psychiatric facilities. But the Court's "evident judgments" apply equally here. While segregated in the SDTP, Mr. Cartagena could not have any contact with his non-disabled peers. JA67. By policy, only prisoners with serious mental illness are admitted into SDTP, *see, e.g.*,

58

JA52, and those in the SDTP are not allowed "anywhere near" people from other units. JA67. Segregating Mr. Cartagena in this way "perpetuates unwarranted assumptions" that people with serious mental illnesses are "incapable or unworthy" of participating in general prison life. Indeed, Mr. Cartagena was forced to endure shackles, a dog leash, and a strip search every time he left his cell, which only furthers this unwarranted assumption. JA67. Additionally, segregation in the SDTP diminished or eviscerated Mr. Cartagena's ability to engage in "family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." Mr. Cartagena could only make four phone calls a month to family or friends. JA66. He was not allowed to work. JA67. He was not allowed to have personal property, which would have expanded his recreational activities and educational advancement. JA66. And he was prohibited from attending religious services, diminishing his cultural enrichment. JA67.

To be sure, the ADA's integration mandate is not without limits. Public entities must provide services to a person with disabilities in the most integrated setting appropriate to the person's needs, so long as it is recommended by treating professionals and the person does not

oppose the setting. *See Olmstead*, 527 U.S. at 601–02. Here, Mr.

Cartagena alleged that treating professionals recommended a less

restrictive setting and that he was not opposed to this setting. *See*

JA75. In fact, Mr. Cartagena repeatedly requested that he be

transferred from the SDTP to a "less restrictive setting such as a S.A.M.

unit or general population[.]" JA41.

     As such, Mr. Cartagena adequately alleged that Defendants

discriminated against him on the basis of disability when they

segregated him in a highly restrictive setting, away from his non-

disabled peers. Indeed, courts around the country have held that the

segregation of prisoners with disabilities violates the ADA. *See, e.g.*,

*Reaves v. Dep't of Correction*, 195 F. Supp. 3d 383, 423 (D. Mass. 2016)

(holding that plaintiff with quadriplegia held in isolation was likely to

prevail on claim that the defendants "violated Title II of the ADA by

failing to provide him opportunities to socialize with other inmates");

*Stiles v. Judd*, No. 8:12-cv-02375-T-27EAJ, 2013 WL 6185404, at *2

(M.D. Fla. Nov. 25, 2013) (holding that plaintiff adequately alleged he

was "unjustifiably isolated from other prisoners on the basis of his

mental illness, despite his suicide watch having ended"); *Henderson v.*

*Thomas*, 913 F.Supp.2d 1267, 1297 (M.D. Ala. 2012) (holding that the categorical segregation of all prisoners with HIV violated the ADA's integration mandate).

The district court erroneously concluded that there were "no facts" suggesting that Mr. Cartagena's mental health disabilities "motivated" Defendants to exclude him from any program or service. JA102. But Defendants' own documents conclusively establish that Mr. Cartagena was placed in the SDTP, and thereby isolated from non-disabled prisoners and excluded from general prison programming, *because of* his serious mental illness. *See* JA49 ("You have been assigned to the program because you meet the criteria and are a Seriously Mentally Ill (SMI) offender.")

Further, the district court construed Mr. Cartagena's allegations narrowly, suggesting that his disability claim arose solely from the fact that Defendants "assign[ed] him to the SDTP unit when they knew its isolation component was not recommended for the mentally ill." JA102. In doing so, the lower court overlooked Mr. Cartagena's repeated allegations that the Defendants failed to "provide the less restrictive setting such as a general population." JA69. Mr. Cartagena also

specifically alleged that the unnecessary isolation "of a disabled person

is a form of discrimination on account of disability in violation of the

[ADA] and the [RA]." JA75. Finally, Mr. Cartagena alleged that

Defendants had unnecessarily isolated him when treating professionals

recommended treatment in a less restrictive setting. JA75. But the

district court once again disregarded its duty to construe a *pro se*

plaintiff's allegations liberally, and failed to apply the relevant law to

Mr. Cartagena's claims.

2.     **Defendants Discriminated Against Mr. Cartagena By Failing To Reasonably Accommodate His Disabilities.**

When passing the ADA, Congress "explicitly found that

discrimination was not limited to 'outright intentional exclusion,' but

was also to be found in the 'failure to make modifications to existing

facilities and practices.'" *Nat'l Fed. Of the Blind*, 813 F.3d at 505

(quoting 42 U.S.C. § 12101(a)(5)). As such, entities must "make

reasonable modifications in policies, practices, or procedures . . . when

necessary to avoid discrimination on the basis on disability[.]" 28 C.F.R.

§ 35.130(b)(7)(i).

Further, Title II places an affirmative obligation on entities to accommodate people with disabilities. 28 C.F.R. § 35.150(a). This affirmative duty is at its "apex" in the prison environment "in light of the uneven power dynamic between prison officials and inmates" and "the fact that departments of corrections have complete control over whether prison inmates (disabled or not) receive any programs or services at all." *Pierce v. D.C.*, 128 F. Supp. 3d 250, 269 (D.D.C. 2015) (Jackson, J.).

Here, the restrictive conditions of the SDTP were particularly harmful to Mr. Cartagena as a result of his mental health disabilities. *See, e.g.*, JA41, JA47 (informing Defendants the conditions were causing him "severe mental anguish and emotional distress"). Mr. Cartagena repeatedly requested less restrictive conditions to accommodate his disabilities. *See, e.g.*, JA30, JA47, JA50 (requesting to be housed in a less restrictive setting such as a "MHU" or general population). But Defendants failed to provide those accommodations. Further, Defendants failed to provide accommodations within the SDTP to create a less restrictive environment. For example, Defendants could have modified the amount of time Mr. Cartagena was allowed outside of his

63

cell or provided access to some personal property or attendance of group religious services. They did not.

At this motion to dismiss stage, Mr. Cartagena plausibly alleged that Defendants discriminated against him on the basis of his disability by failing to provide appropriate accommodations. *See Reaves*, 195 F. Supp. 3d at 423 (holding quadriplegic plaintiff likely to prevail on ADA claims where officials failed to provide accommodations "so that Reaves would not have to spend the remainder of his life in isolation, solely on account of his disability").

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's decision, hold that Mr. Cartagena adequately stated violations of the Eighth Amendment, Fourteenth Amendment, the Americans with Disabilities Act, and the Rehabilitation Act, and remand for further proceedings.

## REQUEST FOR ORAL ARGUMENT

Mr. Cartagena respectfully requests oral argument under Fourth Circuit Rule 34(a). This case presents a question of first impression in this Court: whether the ADA and RA regulate and restrict the

64

placement of seriously mentally ill prisoners in solitary confinement

conditions. Oral argument will materially advance this Court's

resolution of this novel question of law. Oral argument will also assist

the Court in addressing the important questions of constitutional law

raised in this matter under the Eighth and Fourteenth Amendments.

Dated: January 11, 2023                    Respectfully submitted,

                                           */s/ Jennifer Wedekind*

                                           Jennifer Wedekind
                                           AMERICAN CIVIL LIBERTIES UNION
                                           915 15th Street NW
                                           Washington, DC 20005
                                           (202) 548-6610
                                           jwedekind@aclu.org

                                           Marisol Dominguez-Ruiz
                                           AMERICAN CIVIL LIBERTIES UNION
                                           39 Drumm Street
                                           San Francisco, CA 94111
                                           (202) 393-4930
                                           mdominguez-ruiz@aclu.org

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.      This brief complies with the type-volume limitation of Fed.
R. App. P. 32(a)(7)(B) because, excluding the parts of the document
exempted by Fed. R. App. P. 32(f), it contains 12,158 words.

2.      This brief complies with the typeface requirements of Fed. R.
App. P. 32(a)(5) and the type style requirements of Fed. R. App. P.
32(a)(6) because this brief has been prepared in a proportionally spaced
typeface with 14-point Century Schoolbook font.


Dated: January 11, 2023           */s/ Jennifer Wedekind*
                                  Jennifer Wedekind

66

**CERTIFICATE OF SERVICE**

I hereby certify that on January 11, 2023, I electronically filed this brief with the Clerk of Court for the United States Court of Appeals for the Fourth Circuit, causing notice of such filing to be served upon all parties registered on the CM/ECF system.

*/s/ Jennifer Wedekind*
Jennifer Wedekind