No. 22-7279

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

ANGEL CARTAGENA,

*Petitioner-Appellant,*

v.

ALLIE LOVELL, *ET AL.*,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Western District of Virginia

**BRIEF OF APPELLEES**

JASON S. MIYARES
  *Attorney General*

DIANE M. ABATO
  *Senior Assistant Attorney General*

D. PATRICIA WALLACE
  *Assistant Attorney General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile

ANDREW N. FERGUSON
  *Solicitor General*

ERIKA L. MALEY
  *Principal Deputy Solicitor General*

KEVIN M. GALLAGHER
  *Deputy Solicitor General*

ANNIE CHIANG
  *Assistant Solicitor General*

*Counsel for Defendants-Appellees*

April 20, 2023

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................... 1

JURISDICTIONAL STATEMENT ....................................................... 3

ISSUES PRESENTED ....................................................................... 3

STATEMENT ..................................................................................... 4

    I.    Factual background ............................................................... 4

        A.  River North's Secure Diversionary Treatment Program ................................................................ 4

        B.  Cartagena's placement in River North's SDTP .......... 10

    II.   Procedural background ......................................................... 15

STANDARD OF REVIEW .................................................................. 19

SUMMARY OF THE ARGUMENT ...................................................... 20

ARGUMENT ..................................................................................... 22

    I.    The district court correctly held that Cartagena failed to state an Eighth Amendment claim ....................................... 22

        A.  Exhibits attached to Cartagena's complaint and VDOC policies subject to judicial notice undermine his allegations of objectively serious conditions .......... 24

        B.  Cartagena failed adequately to allege that defendants had knowledge of a substantial risk of serious harm from SDTP .............................................. 29

i

II.   The district court correctly held that Cartagena failed to
      state a due process violation...................................................37

      A.   Cartagena failed adequately to allege a protected
           interest ........................................................................38

      B.   By his own allegations, Cartagena received all the
           process he is due...........................................................43

III.  The district court correctly held that Cartagena failed to
      state an ADA or RA claim....................................................48

CONCLUSION ........................................................................54

CERTIFICATE OF COMPLIANCE........................................................55

CERTIFICATE OF SERVICE................................................................56

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ........................................................................ 19, 20

*Baird ex rel. Baird v. Rose,*
  192 F.3d, 462 (1999) .......................................................................... 53

*Constantine v. Rectors & Visitors of George Mason Univ.,*
  411 F.3d 474 (4th Cir. 2005) .............................................................. 48

*Doe v. University of Md. Med. Sys. Corp.,*
  50 F.3d 1261 (4th Cir. 1995) ......................................................... 50, 51

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.,*
  637 F.3d 435 (4th Cir. 2011) .............................................................. 20

*Eastern Shore Markets, Inc. v. J.D. Associates Ltd.,*
  213 F.3d 175 (4th Cir. 2000) .............................................................. 20

*Farmer v. Brennan,*
  511 U.S. 825 (1994) ....................................................... 23, 32, 35, 48

*Fauconier v. Clarke,*
  966 F.3d 265 (4th Cir. 2020) ........................................... 49, 50, 52, 53

*Gordon v. Schilling,*
  937 F.3d 348 (4th Cir. 2019) ............................................................... 5

*Halpern v. Wake Forest Univ. Health Scis.,*
  669 F.3d 454 (4th Cir. 2012) .............................................................. 53

*Hemphill v. Melton,*
  551 F.2d 589 (4th Cir. 1977) .............................................................. 20

*Holloway v. Maryland,*
  32 F.4th 293 (4th Cir. 2022) ......................................................... 19, 20

*Incumaa v. Stirling*,
791 F.3d 517 (4th Cir. 2015)................................................. 42, 43, 47

*Laber v. Harvey*,
438 F.3d 404 (4th Cir. 2006)............................................................ 20

*Lai v. New York City Government*,
163 F.3d 729 (2d Cir. 1998) (per curiam) .........................................52

*Makdessi v. Fields*,
789 F.3d 126 (4th Cir. 2015)...................................................... 32, 48

*Mathews v. Eldridge*,
424 U.S. 319 (1976)................................................................... 46, 47

*Mickle v. Moore*,
174 F.3d 464 (4th Cir. 1999)............................................................ 29

*Miltier v. Beorn*,
896 F.2d 848 (4th Cir. 1990)............................................................ 34

*Palmer v. Circuit Ct. of Cook Cnty., Ill.*,
117 F.3d 351 (7th Cir. 1997)............................................................ 50

*Porter v. Clarke*,
923 F.3d 348 (4th Cir. 2019), *as amended* (4th Cir. May 6,
2019)...................................................................................... *passim*

*Prieto v. Clarke*,
780 F.3d 245 (4th Cir. 2015)............................................................ 38

*Revene v. Charles Cnty. Com'rs*,
882 F.2d 870 (4th Cir. 1989) ........................................................... 31

*Shaw v. Stroud*,
13 F.3d 791 (4th Cir. 1994).............................................................. 32

*Slakan v. Porter*,
737 F.2d 368 (4th Cir. 1984)............................................................ 33

*Smith v. Collins*,
964 F.3d 266 (4th Cir. 2020)........................................... 38, 39, 40, 41

*Thorpe v. Clarke*,
   37 F.4th 926 (4th Cir. 2022) ............................................ 37, 43, 44, 46

*Veney v. Wyche*,
   293 F.3d 726 (4th Cir. 2002) ...................................................... 20, 24

*Vitek v. Jones*,
   445 U.S. 480 (1980) ........................................................................ 18

*Wilkins v. Montgomery*,
   751 F.3d 214 (4th Cir. 2014) ...................................................... 32, 33

*Wilkinson v. Austin*,
   545 U.S. 209 (2005) ............................................................ 38, 43, 46

*Williams v. Branker*,
   462 Fed. Appx. 348 (4th Cir. 2012) .................................................. 41

*Williamson v. Stirling*,
   912 F.3d 154 (4th Cir. 2018) ...................................................... 30, 31

*Wright v. Collins*,
   766 F.2d 841 (4th Cir. 1985) ........................................................... 31

## Other Authorities

Cir. Ct. Case Information, Va. Cts. Case Information,
   https://tinyurl.com/2bfvj4mr .......................................................... 4

Ctr. for Disease Control, *CDC Museum COVID-19 Timeline*
   (last visited Apr. 19, 2023), https://tinyurl.com/yw998ykk ............... 12

Dept. of Health & Human Services, *COVID-19 Vaccine
   Milestones* (last visited Apr. 19, 2023),
   https://tinyurl.com/37tkb25a ......................................................... 12

Governor Ralph Northam, *Temporary Stay at Home Order
   Due to Novel Coronavirus (COVID-19)*, EO 55 (2020) ...................... 27

Joseph Shapiro, *As COVID-19 Spreads in Prisons,
   Lockdowns Spark Fear of More Solitary Confinement*,
   NPR (June 15, 2020), https://tinyurl.com/3w6xu9dt ......................... 42

Massimiliano Esposito, et al., *The Risk of COVID-19 Infection in Prisons and Prevention Strategies: A Systematic Review and a New Strategic Protocol of Prevention* (Feb. 2022), https://tinyurl.com/mr444r82 ...................... 27

U.S. Const. amend. VIII ......................................................... 22

U.S. Const. amend. XIV ........................................................ 37

Va. Dep't of Corr., Operating Procedure 730.1: Mental Health and Wellness Services: Admin. (2021), https://tinyurl.com/3fpyf5fy ................................................. 7

Va. Dep't of Corr., Operating Procedure 730.2: Mental Health and Wellness Services: Screening, Assessment, and Classification (2021), https://tinyurl.com/yckhmznm .................. 7

Va. Dep't of Corr., Operating Procedure 730.3: MHS: Levels of Service (2020), https://tinyurl.com/3bcv9yf3 .......................... *passim*

Va. Dep't of Corr., Operating Procedure 830.1: Institution Classification Management, at 3 (2021), https://tinyurl.com/282hmf25 ......................................... 6, 7

Va. Dep't of Corr., Operating Procedure 830.5: Transfers, Institution Reassignments (2020), https://tinyurl.com/58nhvrz5 .................................... 5, 6, 7, 8

Va. Dep't of Corr., Operating Procedure 841.4: Restorative Housing Units (2021), https://tinyurl.com/5f9zk888 ................. *passim*

## INTRODUCTION

Appellant Angel Cartagena was placed into a diversionary treatment program for inmates with serious mental illness who frequently commit assaults or other disruptive behaviors. Due to their misconduct, these inmates would otherwise be housed under maximum security regulations and procedures. Instead, the program provided treatment for these mentally ill inmates who could not function in the general population without posing a danger to themselves and other inmates and staff. At the same time, the program allowed for regular social interactions, as well as religious observances and work opportunities. An inmate could progress through the program to increasingly greater privileges, culminating in reassignment to the general population. The district court correctly dismissed Cartagena's claims.

First, the district court correctly held that Cartagena failed adequately to allege a violation of the Eighth Amendment. The conditions in the diversionary program did not create an objectively serious risk of harm. Rather, Cartagena was given the particular housing arrangements and medical treatment that his condition required. He experienced fewer

restrictions (and increasing privileges) as he progressed through the program, and he was permitted to participate in social groups and religious observances. Cartagena also failed to allege that prison officials knew that he was at risk of substantial harm from the program—which was designed to *help* him adjust to living safely in the general population.

Second, the district court correctly held that Cartagena failed adequately to allege a due process violation. Cartagena claims that he had a protected liberty interest based on a prison policy that prohibited mentally ill patients from being housed in restrictive housing for more than 28 days. But as prison policies and Cartagena's pleadings make clear, the diversionary program was *not* restrictive housing. And, by his own allegations, Cartagena received all the process he was due: after his reassignment, he was notified of the reasons that he was placed in the diversionary program and given an opportunity to respond through the prison's informal complaint and grievance processes.

Finally, the district court correctly held that Cartagena did not adequately allege violations of the Americans with Disabilities Act and the Rehabilitation Act. Cartagena was not otherwise qualified for the general population due to his dangerous behavior there. Rather than

being placed in restrictive housing, however, his mental illness qualified him for the diversionary treatment program—a program where he could receive specific care for his illness. This Court should affirm.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. Cartagena timely filed a Notice of Appeal from the district court's order granting defendants' motion to dismiss his 42 U.S.C. § 1983 action. JA104–05. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.     Whether the district court correctly dismissed Cartagena's Eighth Amendment claim when Cartagena's pleadings fail adequately to allege objectively serious deprivations and when Cartagena pleaded no facts establishing the defendants' subjective knowledge of a serious risk?

2.     Whether the district court correctly dismissed Cartagena's Due Process Clause claim when Cartagena failed adequately to allege any protected liberty interest based on state prison procedures, and Cartagena received all the process he was due?

3.     Whether the district court correctly dismissed Cartagena's Americans with Disabilities Act and Rehabilitation Act claims where the

exhibits attached to Cartagena's complaint establish that he was not otherwise qualified for the general population, and he was not discriminated against on the basis of any disability?

## STATEMENT

### I. Factual background

### A. River North's Secure Diversionary Treatment Program

At all times relevant to his claims, Cartagena was confined at River North Correctional Center (River North), serving a term of 35 years for, among other crimes, first-degree murder.[1] River North is a prison facility operated by the Virginia Department of Corrections (VDOC). JA86. It houses certain inmates in a "residential programming unit with bed assignments" called the Secure Diversionary Treatment Program (SDTP). Virginia Dep't of Corr., Operating Procedure 841.4: Restorative Housing Units, at 4 (2021) (hereinafter, Operating Procedure 841.4),

---

[1] See Circuit Court Case Information, Virginia Courts Case Information, https://tinyurl.com/2bfvj4mr (use drop down menu to select "Henrico Circuit Court," then search for "Cartagena, Angel").

https://tinyurl.com/5f9zk888.[2] SDTP is a "formalized program that operates within structured security regulations and procedures, and provides for programming and treatment services conducive with evidence based treatment protocols and individualized treatment plans." *Ibid.*

Some inmates suffer from serious mental illnesses, and also engage in conduct that is dangerous to themselves or others, or is seriously disruptive to the orderly functioning of the facility. SDTP "provides treatment in a secure setting" for these inmates. Virginia Dep't of Corr., Operating Procedure 730.3: MHS: Levels of Service, at 10 (2020) (hereinafter, Operating Procedure 730.3), https://tinyurl.com/3bcv9yf3. To be eligible for SDTP, an inmate must have a "Serious Mental Illness" *and* "often engage in assaultive, disruptive, and/or unmanageable behaviors." JA29; see also Operating Procedure 730.3 at 10 (same).

The process of deciding whether to assign an inmate to SDTP includes numerous layers of review. See Virginia Dep't of Corr.,

---

[2] Cartagena asks this Court to take judicial notice of this "publicly available information from a government website." Cartagena Br. 28 n.4. Appellees have no objection to the Court taking judicial notice of this and other VDOC policies. See *Gordon v. Schilling*, 937 F.3d 348, 353 n.6 (4th Cir. 2019) (taking judicial notice of VDOC operating procedure).

Operating Procedure 830.5: Transfers, Institution Reassignments, at 15–16 (2020) (hereinafter, Operating Procedure 830.5), https://tinyurl.com/58nhvrz5. First, an institutional employee schedules and conducts an Institutional Classification Authority (ICA) Hearing. *Id.* at 16. Because the ICA hearing is conducted to consider an inmate's removal from the general population, the hearing must be a "formal due process hearing," which requires "a prior formal notification to the inmate indicating the reason for, purpose of, and possible results of the classification hearing, the inmate's right to be present at the hearing, and notice of the results of the hearing and the reason for the decision." See Virginia Dep't of Corr., Operating Procedure 830.1: Institution Classification Management, at 3 (2021), https://tinyurl.com/282hmf25.

If the hearing concludes with a recommendation of assignment to the SDTP, the Chief of Housing and Programs at the referring institution prepares an "Assignment to SDTP" form. Operating Procedure 830.5 at 16. The referring institution's Psychology Associate Senior—an individual with at least a Master's degree and with knowledge, training, and skills in the diagnosis and treatment of mental disorders—also completes and submits an assessment to the referring region's Mental

Health Clinical Supervisor. *Ibid.*; see also Virginia Dep't of Corr., Operating Procedure 730.2: Mental Health and Wellness Services: Screening, Assessment, and Classification, at 3 (2021), https://tinyurl.com/yckhmznm (defining "Psychology Associate").

The referring region's Mental Health Clinical Supervisor—also an individual with at least a Master's degree and knowledge, training, and skills in the diagnosis and treatment of mental disorders—next conducts a review, and, if the Supervisor approves the recommendation, the Regional Operations Chief then reviews it. Operating Procedure 830.5 at 16; see also Virginia Dep't of Corr., Operating Procedure 730.1: Mental Health and Wellness Services: Administration, at 3 (2021), https://tinyurl.com/3fpyf5fy (defining "Mental Health Clinician"). If approved again, the Psychology Associate Senior at VDOC's Central Classification Services must then review the recommendation. Operating Procedure 830.5 at 16. The Special Program Manager for Diversionary Housing at VDOC will also verify that the necessary forms are complete and accurate and submit the documents for further review by the Multi-Institution Treatment Team (MITT). *Ibid.* MITT decides whether the

inmate should be assigned to SDTP and, if so, determines the appropriate SDTP assignment. *Ibid.*

River North's SDTP is comprised of two units, each with a series of phases: the Secure Communicative and Reintegration Environment (SCORE) unit and the Enhanced Prosocial Interaction Community (EPIC) unit. See Operating Procedure 730.3 at 10; see also JA36 (Cartagena describing "mov[ing] through the phases of SCORE"). In both units, restrictions are relaxed and privileges increased as inmates progress through the phases of the program. Although SCORE is the more restrictive of the two units, SCORE "is not isolation." JA35. Rather, while in SCORE, inmates increase "out of cell time for both structured therapeutic and unstructured activities on the unit." JA32. They "are allowed to participate in social groups for recreation, programming, and social activities," JA35, and can "experience religious services inside their assigned cell," as well as "contact the chaplain for religious guidance, study materials, and [] participate in seasonal activities," JA32. As the inmate progresses from the SCORE unit to the EPIC unit, "structured

social activity increases," including that "offenders may attend religious services" communally. JA32.

SDTP is different from Restrictive Housing (now known as Restorative Housing). Restrictive Housing Units (RHUs) are "[s]pecial purpose bed assignments operated under maximum security regulations and procedures, and utilized under proper administrative process, for the personal protection or custodial management of inmates." Operating Procedure 841.4 at 4. SDTP units, by contrast, "operate[] within structured security regulations and procedures," but focus on "programming and treatment services conducive with evidence based treatment protocols and individualized treatment plans." *Ibid.* Indeed, "[e]very effort" is made to "manage [inmates'] behaviors within" SDTP; it is only when an inmate in SDTP "continues to endanger others due to assaultive or destructive behavior after other interventions have been tried" that the inmate "may be reclassified to Restrictive Housing." JA29.

VDOC policies provide that seriously mentally ill inmates "must be moved out of RHU status within 28 days of the inmate's initial placement on general detention unless" an exemption is granted. Operating Procedure 841.4 at 7. A similar temporal limitation does not apply to

SDTP. In fact, inmates who approach the time limit for RHUs can be moved to SDTP: if a seriously mentally ill inmate cannot be assigned to the general population after 28 days in an RHU because he "frequently engages in assaultive, disruptive, and/or unmanageable behaviors," he can be referred to SDTP. JA29; see also Operating Procedure 730.3 at 10 (same).

### B. Cartagena's placement in River North's SDTP

Cartagena alleges that VDOC classified him as having a serious mental illness (SMI)—a classification Cartagena does not dispute. JA80. In November 2019, due to "meet[ing] the criteria for Serious Mental Illness," as well as "often engag[ing] in assaultive, disruptive, and/or unmanageable behaviors," the MITT team referred Cartagena to the SDTP program. JA29; see also JA46 ("You were referred to the SDTP program by the MITT team due to your inability to function in [general population]."). There were "multiple levels of review concerning this placement"; the "Mental Health Clinical Supervisor as well as the

Regional Operations Chief participate[d] with extensive external review by [MITT]." JA35.

 For the next eighteen months, Cartagena was "in and out of the SDTP." JA48. Cartagena alleges that he "was secluded" while in SDTP, and lost many privileges. JA66. He alleges, for example, that he could make only four phone calls a month and had no visitation rights while in SDTP. JA87. He also alleges that inmates within SDTP "cannot be anywhere near other offenders outside th[at] unit." JA67. But the exhibits attached to his complaint contradict many of his allegations. The SCORE unit of SDTP "is not isolation"; rather, Cartagena and other inmates were "allow[ed] to participate in social groups for recreation, programming, and social activities." JA35.[3]

In April 2020, just a few months after Cartagena began his tenure at SDTP, River North "suspended" "all programming" due to the COVID-

_____

[3] In addition, although Cartagena's allegations are taken as true at the motion to dismiss stage, defendants note that many are inaccurate. For instance, Cartagena was permitted to use the phone from the beginning of his assignment in SDTP; phone records demonstrate that he placed 28 calls in the first week alone. Cartagena also gained many privileges as he progressed through the phases of SDTP. After

19 pandemic. JA43; see also JA59 (Cartagena acknowledging in September 2020 that "the pandemic started in April [which is] when they stopped all gatherings"). This suspension applied to "all offenders" in River North, not only to those in SDTP. JA43. The purpose of the suspension was to slow the spread of COVID-19 infections, for which no vaccines or effective treatments were yet available. JA43; Department of Health & Human Services, *COVID-19 Vaccine Milestones* (last visited Apr. 19, 2023), https://tinyurl.com/37tkb25a (explaining that "[t]he first deliveries of the COVID-19 vaccines" did not take place until December 2020 and COVID-19 vaccine eligibility was not expanded "to all Americans" until May 2021).

This approach was consistent with expert public health guidance at the time, which recommended "social distancing" to prevent infection, particularly for those in congregate settings. *E.g.*, Centers for Disease Control, *CDC Museum COVID-19 Timeline* (last visited Apr. 19, 2023),

---

approximately two months in SDTP, in February 2020, he had advanced to SCORE Phase IV, during which he had restraint-free movement, with pat-down searches upon exiting and entering his cell, and outside recreation in the yard without confinement to a module. Eventually, Cartagena advanced to EPIC Phase III, during which he began a job as a houseman working first the floors and then the showers.

https://tinyurl.com/yw998ykk. Thus, for much of the period that Cartagena was assigned to SDTP, the pandemic—rather than his SDTP placement—limited the social programs and visitation available to Cartagena. See JA43.

While in SDTP, Cartagena filed many informal complaints and grievances. Between May and September 2020, Cartagena filed over fifteen informal complaints or grievances. Several of those dealt with religious issues. *E.g.*, JA26; JA27; JA29; JA32. Many others took issue with his assignment to SDTP and its alleged effects on his mental state. *E.g.*, JA29, JA30, JA35, JA36, JA37, JA40, JA41, JA46, JA49, JA50, JA52, JA55, JA56, JA57.

These informal complaints and grievances were denied. Many were denied on the ground that Cartagena did not timely file his formal grievances. *E.g.*, JA31; see also, *e.g.*, JA37; JA42; JA48. But in several instances, River North officials responded to Cartagena's complaints with explanations of why Cartagena had been assigned to SDTP and his rights and responsibilities within the program. For instance, one response explained that MITT had referred Cartagena to SDTP due to his inability to function in the general population. JA46. Cartagena

"ha[d] been assigned to the program because [he] meet[s] the criteria *and* [is] a Seriously Mentally Ill (SMI) offender." JA56 (emphasis added); see also JA29; JA40; JA49.

Before placing an inmate in SDTP, officials explained, there are multiple levels of review, including "extensive external review by a [MITT] team" and "[t]he Mental Health Clinical Supervisor as well as the Regional Operations Chief." JA35. And "[o]nce criteria for SMI are met, the offender is further reviewed to determine the appropriate SDTP program of housing and treatment to best meet the offender's needs." JA49; see also JA40. Cartagena "[was] free to refuse any and all programming" while in SDTP. JA46. He "do[es] not, however, decide where [he is] housed." JA46.

In April 2021, after he refused to take his medication, Cartagena reported that he was experiencing suicidal thoughts and hearing voices. JA29; JA41. He then attempted suicide in SDTP by "swallow[ing] a toothpaste tube and electrical wirings," as well as "cutting himself with a razor deeply in his right forearm." JA67. Cartagena "voiced his suicidal ideation to [an] officer," who then "called the supervisor and the nurse" to Cartagena's cell. JA67. A nurse took Cartagena to the hospital, where

he refused medical treatment. JA67. He was accordingly sent back to River North, where he was placed in restraints "to prevent further self-harm." JA89. Upon complaining of pain, Cartagena was taken back to the hospital for surgery to remove the foreign objects from his stomach. JA67.

About a month later, Cartagena was transferred to Wallens Ridge State Prison and attempted to commit suicide again "by lacerating his right arm." JA68. Although VDOC "placed [Cartagena] on suicide precautions," he subsequently lacerated his arm with a razor again. JA68. In August 2021, a state court involuntarily committed Cartagena to a mental health hospital for inmates, Marion Correctional Treatment Center, so that he could receive intensive care for his serious mental health needs. JA68. He was housed in that hospital when he filed his complaint in this case. JA68, 77.

## II. Procedural background

Cartagena filed suit pro se in federal district court. In his operative complaint, Cartagena named as defendants nine individuals: Allie Lovell, Director of SDTP in Virginia; T. Dowell, Unit Manager of SDTP Unit A-1; Barry Kanode, Warden of River North; Kilbourne, Chief of

Housing and Programming; Dr. Haynes, SDTP unit psychiatrist; Harold Clarke, Director of VDOC; David Robinson, VDOC's Chief of Operations; Eric Madsen, in charge of Institutional Classification; and Carl Manis, Regional Administrator of the Western Region (collectively, defendants). JA63. Although the complaint makes little attempt to differentiate among defendants, Lovell, Dowell, Haynes, and Kilbourne are alleged to be members of MITT. JA35; JA71. Madsen is alleged to oversee all transfers of incarcerated people with SMI, including into SDTP. JA73. Clarke and Robinson are alleged to develop, implement, and enforce policies and procedures, including those that govern SDTP. JA74. And Manis is alleged to be Lovell's supervisor. JA70.

The operative complaint brought suit under 42 U.S.C. § 1983, alleging claims under the First Amendment, Eighth Amendment, Due Process Clause, Americans with Disabilities Act (ADA), and Rehabilitation Act (RA). JA62, 68–69. The complaint contends that defendants' "use of bodily restraints [to] keep[] [Cartagena] . . . [for ]18[] months" in the SDTP unit "is a form of cruel and unusual punishment in violation of the Eighth Amendment [as well as] a violation of his Liberty Interests enshrined under the Fourteenth Amendment of the U.S.

Constitution." JA69. The complaint also alleges that defendants' "fail[ure] to provide [a] less restrictive setting [than SDTP] such as general population," and the "decision to keep [Cartagena] isolated in [SDTP] . . . without a proper judicial order was a violation of his Due Process Right under the Fourteenth Amendment." JA69.

Finally, the complaint raises ADA and RA claims, alleging that defendants "discriminated against [Cartagena] by subjecting him to unnecessary isolation when treating professionals recommended treatment in a less restrictive setting." JA75. For those alleged injuries, Cartagena requested $80,000, in addition to "punitive damages" and injunctive relief ordering defendants to "never again detain him in the SDTP." JA76.

After liberally construing Cartagena's complaint, see JA89, the district court granted defendants' motion to dismiss for failure to state a claim. First, the district court held that Cartagena failed to state a claim under the Eighth Amendment because he did not allege "facts showing that any defendant knew the SDTP living conditions themselves would pose a threat to [his] health or safety, or that the conditions alone could cause or were causing, him physical or emotional injuries." JA94. Indeed,

the court noted, "Cartagena's submissions indicate that the SDTP unit is designed for inmates like himself, who have been diagnosed with SMI and who have not functioned well in other types of VDOC housing." JA94.

Second, the court addressed Cartagena's due process claims. *See* JA89–99 (interpreting his complaint to invoke both a "'substantive' due process right to freedom . . . [and] his right to procedural due process before being deprived of a state-created liberty interest"). The court held that Cartagena, as a convicted inmate, "does not have an inherent constitutionally protected liberty interest in release from solitary confinement or in remaining under general population prison conditions." JA97. It distinguished *Vitek v. Jones*, 445 U.S. 480 (1980), because "[m]oving Cartagena within the prison system to the SDTP unit did not transfer him to a dedicated mental health treatment facility or implicate the stigmatization that concerned the courts in th[at] case." JA96–99. And neither "Virginia mental health statutes" nor "VDOC operating procedure[s]" "support [Cartagena's] claim of a liberty interest in avoiding assignment to the SDTP." JA99–101.

Last, the court dismissed Cartagena's ADA and RA claims. The court held that even assuming Cartagena's mental health issues could

18

qualify as a disability under the ADA and RA, Cartagena had not "alleged facts indicating that, due to his disability, the defendants deprived him of benefits for which he was otherwise qualified," nor "facts suggesting that his mental health issues motivated anyone to exclude him from any prison programming or service." JA102.[4]

Cartagena then appealed. JA105.

## STANDARD OF REVIEW

This Court reviews de novo a district court's dismissal of a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). *Holloway v. Maryland*, 32 F.4th 293, 298 (4th Cir. 2022). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ibid.* (quotation marks omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim is facially plausible when the plaintiff pleads factual content that

---

[4] The district court also held that Cartagena had alleged "no factual support for an Eighth Amendment claim that any defendant deprived Cartagena of medical or mental health care," JA96, and that Cartagena had not stated facts meeting any of the required elements for a Free Exercise of Religion claim, JA92. Cartagena does not challenge those rulings on appeal. Cartagena Br. 11 n.2.

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ibid.* (quoting *Iqbal*, 556 U.S. at 678).

Although a court "must take the facts in the light most favorable to the plaintiff," it "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Markets, Inc. v. J.D. Associates Ltd.*, 213 F.3d 175, 180 (4th Cir. 2000). Documents attached to or incorporated by reference in the complaint are considered as part of the complaint for purposes of evaluating a motion to dismiss. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011). The Court need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit." *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002). Courts construe pro se complaints liberally, *Hemphill v. Melton*, 551 F.2d 589, 590–91 (4th Cir. 1977), but a court's "task is not to discern the unexpressed intent of the plaintiff, but what the words in the complaint mean," *Laber v. Harvey*, 438 F.3d 404, 413 n.3 (4th Cir. 2006).

## SUMMARY OF THE ARGUMENT

This Court should affirm the dismissal of Cartagena's complaint. First, Cartagena did not adequately allege that he was subjected to cruel

and unusual punishment in violation of the Eighth Amendment. Cartagena attempts to engraft this Court's solitary confinement case law onto the SDTP. But the exhibits he attached to his complaint, and the judicially noticeable VDOC policies he references, contradict that argument. SDTP is unlike the solitary confinement conditions in the case law Cartagena relies upon. The complaint thus does not adequately allege the sort of objectively serious risk of harm that the Eighth Amendment forbids. Nor did Cartagena allege facts showing that defendants had subjective knowledge of the alleged risk of harm, particularly as to the six defendants who were not directly involved with Cartagena's treatment.

Second, Cartagena failed to state a due process violation. Cartagena misapprehends the VDOC policies at issue in this case, which did not set a time limit on assignments to SDTP. And, even if Cartagena could establish a liberty interest, he was given all the process he was due: post-deprivation notice and an opportunity to respond through the prison's informal complaint and grievance procedures.

Third, Cartagena failed adequately to allege any violation of the ADA or RA. He has not alleged facts demonstrating that he was

21

otherwise qualified for the general population. He also has not alleged facts showing that VDOC discriminated against him on the basis of his disability, given that he was removed from general population due to his violent and disruptive conduct, and his mental illness was relevant only to the decision to place him in SDTP as opposed to a restrictive unit so that he could receive needed treatment.

## ARGUMENT

### I. The district court correctly held that Cartagena failed to state an Eighth Amendment claim

Cartagena failed to state a valid claim under the Eighth Amendment. The exhibits attached to Cartagena's complaint and VDOC policies subject to judicial notice demonstrate that SDTP did not create an objectively serious risk of harm. In addition, Cartagena failed adequately to allege facts showing that defendants were subjectively aware of a serious risk of harm. SDTP is unlike the solitary confinement conditions in the literature and jurisprudence Cartagena highlights, making those sources inapposite.

The Eighth Amendment prohibits the "inflict[ion]" of "cruel and unusual punishments[.]" U.S. Const. amend. VIII. That amendment applies to the States through the Fourteenth Amendment's Due Process

Clause, and "applies to claims by prisoners against corrections officials challenging conditions of confinement." *Porter v. Clarke*, 923 F.3d 348, 355 (4th Cir. 2019), *as amended* (4th Cir. May 6, 2019).

An Eighth Amendment claim has both an objective component and a subjective component. For the objective component, "the deprivation alleged must be, objectively, sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quotation marks omitted). A "sufficiently serious" deprivation "must be extreme—meaning that it poses a serious or significant physical or emotional injury resulting from the challenged conditions or a substantial risk of serious harm resulting from exposure to the challenged conditions." *Porter*, 923 F.3d at 355 (cleaned up). For the subjective component, the Supreme Court has "adopt[ed]" the "subjective recklessness" test, *Farmer*, 511 U.S. at 840, which evaluates whether prison officials acted with "deliberate indifference," *Porter*, 923 F.3d at 361 (quotation marks omitted). To satisfy that standard, plaintiffs must "show that the official knew of and disregarded an

excessive risk to inmate health or safety." *Ibid.* (cleaned up). Cartagena's complaint fails to satisfy either prong.

### A. Exhibits attached to Cartagena's complaint and VDOC policies subject to judicial notice undermine his allegations of objectively serious conditions

Cartagena's complaint did not adequately show a "sufficiently serious" deprivation; in fact, as the district court noted, "Cartagena's submissions indicate that the SDTP unit is designed for inmates like himself, who have been diagnosed with SMI and who have not functioned well in other types of VDOC housing." JA94. This Court need not credit allegations that contradict the exhibits Cartagena attached to his complaint and the official policies of which he asks this Court to take judicial notice. *Veney*, 293 F.3d at 730. SDTP is unlike the solitary confinement conditions Cartagena highlights in case law and literature; rather, it is a remedial program designed to reintegrate inmates who have mental illnesses and exhibit aggressive behaviors.

Cartagena was referred to SDTP because he met the criteria for serious mental illness and "often engag[ed] in assaultive, disruptive, and/or unmanageable behaviors." JA29; see also Operating Procedure 730.3 at 10 (same). He was "in and out" of SDTP for eighteen months.

24

JA48. Although Cartagena alleges that he "was secluded" while in SDTP, the exhibits attached to his complaint demonstrate that SDTP "is not isolation"; rather, Cartagena and other inmates were "allow[ed] to participate in social groups for recreation, programming, and social activities." JA35.

SDTP provides inmates with particular housing and treatment "to best meet the offender's needs." JA49. Although there are "structured security regulations and procedures," SDTP also "provides for programming and treatment services conducive with evidence based treatment protocols and individualized treatment plans." Operating Procedure 841.4 at 4. At River North, SDTP is comprised of two units (SCORE and EPIC), and those participating in SDTP experience fewer restrictions, and increasing privileges, as they progress through the phases within the two units. See pp.8–9, *supra.* For example, in SCORE, offenders may participate in social groups, and may participate in religious services inside their assigned cell (as well as contact a chaplain, obtain study materials, and participate in seasonal activities). See p.8,

*supra*. In the EPIC unit, "structured social activity increases," including that "offenders may attend religious services" communally. JA32.

Cartagena erroneously conflates SDTP with Restrictive Housing Units (RHUs). See Cartagena Br. 28 n.4. RHUs are "[s]pecial purpose bed assignments operated under maximum security regulations and procedures, and utilized under proper administrative process, for the personal protection or custodial management of inmates." Operating Procedure 841.4 at 4. RHU and SDTP are entirely different housing classifications, used to address different circumstances, and with markedly different procedures and programming. Operating Procedure 841.4; see pp.9–10, *supra*. Indeed, "[e]very effort" is made to "manage [offenders'] behaviors within" SDTP; it is only when an offender in SDTP "continues to endanger others due to assaultive or destructive behavior after other interventions have been tried" that the offender "may be reclassified to Restrictive Housing." JA29.

Cartagena's arguments also ignore the effect of the COVID-19 pandemic, which began just months after Cartagena was assigned to the SDTP. See pp.10–12, *supra*. Again, Cartagena's own exhibits state that social gatherings and programming were suspended in April 2020 to slow

26

the spread of COVID-19 infections. JA43, 45, 59. This suspension applied *throughout* River North, and was not particularized to SDTP. See p.12, *supra*. Suspending social gatherings in response to the COVID-19 pandemic was consistent with the expert public health guidance at the time, which recommended "social distancing" to prevent infections, during a period when vaccines and effective treatments had not yet become available. See pp.12–13, *supra*.

Indeed, emergency health orders at the time prohibited many social gatherings even for the general public. *E.g.*, Governor Ralph Northam, *Temporary Stay at Home Order Due to Novel Coronavirus (COVID-19)*, EO 55 (2020) (mandating that "individuals in Virginia . . . must at all times maintain social distancing of at least six feet from any other person" when "us[ing] shared or outdoor spaces"). And congregate settings such as prisons were at particularly high risk for the spread of infection. Massimiliano Esposito, et al., *The Risk of COVID-19 Infection in Prisons and Prevention Strategies: A Systematic Review and a New Strategic Protocol of Prevention* (Feb. 2022), https://tinyurl.com/mr444r82. Implementing social distancing measures "clearly furthered a legitimate penological interest in preventing the

spread of the virus." JA92; *cf. Porter*, 923 F.3d at 362–63 (concluding that "a legitimate penological justification can support" finding that "adverse treatment" in prison conditions is not an Eighth Amendment violation).

Cartagena contends that it is "settled law in this Circuit that solitary confinement conditions objectively pose a substantial risk of serious harm and can thus violate the Eighth Amendment." Cartagena Br. 19 (citing *Porter*, 923 F.3d at 357). But again, SDTP is "not isolation." See p.8, *supra.* And *Porter*'s holding was cabined to the particular facts before the Court concerning Virginia's death row—where inmates spent, "for years, between 23 and 24 hours a day alone in a small cell with no access to congregate religious, educational, or social programming." *Porter*, 923 F.3d at 357 (cleaned up). The Court concluded that "isolated confinement, *under conditions closely analogous to those* [the *Porter* plaintiffs] *challenge*, creates a substantial risk of psychological and emotional harm, which risk is sufficient to satisfy the objective prong." *Id.* at 361.

*Porter* contrasted Virginia death row inmates—who were placed in solitary confinement "based on their sentence alone and [not] provide[d] an avenue for removing themselves from segregation"—with inmates in

another case who "were placed in segregation based on their *in-prison conduct* and were removed from segregation if they" renounced their gang membership. *Id*. at 359 (citing *Mickle v. Moore*, 174 F.3d 464, 466–67 (4th Cir. 1999)). Here, Cartagena does not allege—nor could he—that he was placed in SDTP based on his sentence alone, or that he had no avenue for removing himself from the alleged segregation. In fact, he alleges exactly the opposite. See, *e.g.*, JA64; JA36 (inmate can avoid alleged isolation by "mov[ing] through the phases [by] comply[ing] with treatment"). *Porter* also did not involve social distancing measures to prevent the spread of an infectious disease during a pandemic. Accordingly, Cartagena's complaint does not demonstrate that SDTP conditions were sufficiently objectively serious to constitute cruel and unusual punishment.

### B. Cartagena failed adequately to allege that defendants had knowledge of a substantial risk of serious harm from SDTP

The district court correctly held that Cartagena failed to allege facts "showing that any defendant knew the SDTP living conditions themselves would pose a threat to Cartagena's health or safety, or that the conditions alone could cause or were causing, him physical or emotional injuries." JA94. Indeed, as to most of the defendants, the

complaint fails to allege facts showing their subjective knowledge at all. Rather, the complaint essentially asks the Court to impose vicarious liability, which is not a valid basis for an Eighth Amendment claim of cruel and unusual punishment. Even as to the remaining defendants, Cartagena's allegations do not show subjective knowledge that there was a substantial risk of serious harm to Cartagena due to his placement in SDTP—especially since, as the district court correctly recognized, "the SDTP unit is designed for inmates like [Cartagena], who have been diagnosed with SMI and have not functioned well in other types of VDOC housing." JA94.

For six of the nine defendants, the complaint contains no factual allegations "affirmatively show[ing] that the official charged acted personally in the deprivation of the plaintiff's rights." *Williamson v. Stirling*, 912 F.3d 154, 171 (4th Cir. 2018). For instance, as to Clarke, the Director of VDOC, and Robinson, the Chief of Operations, the complaint alleges only that they "fail[ed] to make policies prohibiting placing Plaintiff in detention" in SDTP. JA73–75. That allegation is plainly insufficient. Clarke and Robinson cannot be held liable on the basis that because they run VDOC, they are liable for any violations that occur in

30

VDOC facilities; the Eighth Amendment does not permit such vicarious liability. *Williamson*, 912 F.3d at 171 ("[T]he official's own individual actions must have violated the Constitution." (quotation marks omitted)); see also, *e.g.*, *Revene v. Charles Cnty. Com'rs*, 882 F.2d 870, 874 (4th Cir. 1989) ("[T]here is no vicarious liability under § 1983."). Rather, the complaint must allege facts showing that Clarke and Robinson were personally involved with any violation and had subjective knowledge that conditions in SDTP violated Cartagena's Eighth Amendment rights. See *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985) (defendant must have "personal knowledge of and involvement in the alleged deprivation of appellant's rights in order to be liable."). It fails to do so.

The allegations are particularly insufficient given that, under VDOC policy, SDTP "provides for programming and treatment services conducive with evidence based treatment protocols and individualized treatment plans," to "best meet the offender's needs." Operating Procedure 841.4 at 4; JA49. Thus, allegations that Clarke and Robinson "fail[ed] to make policies" prohibiting the use of SDTP, JA73–75, do not show that they had subjective knowledge of the alleged unconstitutional conditions. To the contrary, under VDOC policies, SDTP was the best

environment for Cartagena to get the treatment he needed for his serious mental illness, while also fulfilling VDOC's constitutional duty to protect Cartagena and others from his violent and disruptive conduct. See *Farmer*, 511 U.S. at 833 ("[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners."); *Makdessi v. Fields*, 789 F.3d 126, 132 (4th Cir. 2015) ("Prison officials are . . . obligated to take reasonable measures to guarantee inmate safety.").

The allegations are similarly deficient for Manis, the Regional Administrator, and Kanode, the Warden of River North. The complaint does not allege that either was personally involved with the alleged violations, instead asserting that they should be held liable for the alleged "unconstitutional behavior of [their] subordinates." JA69, 71. But such supervisory liability under section 1983 is highly limited. The complaint must allege facts showing the "supervisor's knowledge of conduct" by the subordinate, *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994), that "poses an unreasonable risk of harm of constitutional injury," *Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014). Further, the supervisor's response to that risk must be "so inadequate as to show deliberate indifference," *Shaw*, 13 F.3d at 799 (quotation marks omitted),

32

such as "continued inaction in the face of documented widespread abuses," *Wilkins*, 751 F.3d at 226; see also, *e.g.*, *Slakan v. Porter*, 737 F.2d 368, 373–74 (4th Cir. 1984) (finding supervisory liability appropriate where a prison warden "was responsible for the day-to-day operations . . . and for the training and conduct of the guards [as well as] . . . knew of and condoned the use of high-pressure water hoses against inmates housed in one-man cells on at least seven occasions . . . [and even] on one occasion . . . personally approved of the use of a high-pressure hose against an inmate who was handcuffed and confined in a cell by himself").

The factual allegations here do not show that either Manis or Kanode were personally involved with assigning Cartagena to SDTP or with creating the alleged unconstitutional conditions at SDTP. Nor do they show that Manis and Kanode personally knew of "widespread documented abuses" at SDTP and failed to take actions in response. *Wilkins*, 751 F.3d at 226. Absent such allegations, the mere fact that Manis and Kanode had supervisory responsibilities over River North is inadequate to state a claim that they personally violated Cartagena's Eighth Amendment rights. *E.g.*, *Slakan*, 737 F.2d at 373 (explaining that

33

it is insufficient that a defendant had supervisory responsibilities such as policymaking because "a supervisor cannot be expected to promulgate rules and procedures covering every conceivable occurrence within the area of his responsibilities").

Defendants Lovell and Madsen are both alleged to have played a role in Cartagena's initial assignment to SDTP. JA64, 73. Lovell is alleged to be a member of MITT, while Madsen is alleged to be otherwise involved with the "transfer assignment of the seriously mentally ill prisoners." JA64. But the complaint "has not alleged facts on which [Cartagena] could show" that Lovell and Madsen—or Clarke, Robinson, Kanode, and Manis—"knew of any risk that the SDTP unit (designed for SMI inmates) would worsen [Cartagena's] mental health conditions." JA95. And because these defendants "do not have medical or mental health expertise, they could lawfully rely on Dr. Haynes' professional judgment in deciding how best to house Cartagena under conditions that could safely accommodate the potential harms that his mental illnesses themselves posed." JA95; see also *Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990) (prison wardens are "entitled to rely upon their health care providers' expertise," and were not liable for deficient medical care

provided to inmate), overruled in part on other grounds by *Farmer v. Brennan*, 511 U.S. 825 (1994). The allegations provide no factual basis for concluding that any of these defendants subjectively knew that Cartagena was at a substantial risk of serious harm in SDTP, rather than believing he was getting the help he needed to *avoid* substantial risk of serious harm.

The complaint has the most allegations concerning the involvement of Dr. Haynes, Kilbourne, and Dowell, but they are still insufficient to state an Eighth Amendment claim. Dr. Haynes was the psychiatrist of the SDTP unit; Dowell was the unit manager of SDTP unit A-1; and Kilbourne was the chief of housing and programming. JA63. All three are alleged to be members of MITT, and Kilbourne responded to many of Cartagena's grievances and informal complaints regarding SDTP. *E.g.*, JA35, 49. The complaint, however, still lacks specific factual allegations demonstrating that these defendants subjectively knew of a risk of serious harm to Cartagena, and were deliberately indifferent to that risk. *Farmer*, 511 U.S. at 840; *Porter*, 923 F.3d at 361.

Cartagena contends that all defendants must have had subjective knowledge of the risk of serious harm because "VDOC policy itself

provides that incarcerated people with serious mental illness should not be held in solitary confinement conditions for more than twenty-eight days." Cartagena Br. 28. VDOC Operating Procedure 841.4 actually provides that inmates with serious mental illnesses "must be moved out of *RHU status* within 28 days of the inmate's initial placement on general detention" unless an exemption is granted. See pp.9–10, *supra.* RHU status is a specific type of status within VDOC and, significantly, is different than SDTP. See p.9, *supra.* And, consistent with that policy, Cartagena was never placed in RHU status for longer than 28 days.

Cartagena also argues that "defendants knew of the substantial risk of serious harm that solitary confinement conditions posed to [Cartagena], yet isolated him in the SDTP regardless." Cartagena Br. 25. But again, those participating in SDTP experience fewer restrictions, and increasing privileges, as they progress through the phases of the program. See pp.8–9, *supra.* SDTP allows for social programming, communal religious gatherings, and other types of social interaction. See

p.8, *supra*.[5] Cartagena's contention that the "established scientific and judicial consensus is such that the risk of harm to prisoners with serious mental illness in solitary confinement is 'obvious,'" Cartagena Br. 29, is therefore a red herring. The district court correctly dismissed Cartagena's Eighth Amendment claim.

## II. The district court correctly held that Cartagena failed to state a due process violation

The district court also correctly held that Cartagena failed to state a claim under the Fourteenth Amendment's Due Process Clause. The Due Process Clause provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. To successfully plead a due process claim, "a plaintiff

---

[5] Cartagena argues that this Court "has repeatedly found that VDOC officials are well aware that solitary confinement conditions pose a substantial risk of serious harm." Cartagena Br. 29 (citing *Porter*, 923 F.3d at 361 and *Thorpe v. Clarke*, 37 F.4th 926, 935 (4th Cir. 2002)). But *Porter* held that the plaintiffs in that case had demonstrated that the particular individual defendants at issue there "in fact, were aware of the substantial risk of psychological or emotional harm posed by solitary confinement." *Porter*, 923 F.3d at 361 (emphasis added). The Court did not hold that all VDOC officials necessarily always have subjective knowledge that solitary confinement poses a substantial risk of serious harm, and did not consider SDTP at all. And the subjective prong was not even at issue in *Thorpe*, where the defendants "agree[d]" that the plaintiffs had "adequately pleaded both [Eighth Amendment] prongs." *Thorpe*, 37 F.4th at 933.

must (1) identify a protected liberty or property interest and (2) demonstrate deprivation of that interest without due process of law." *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015). Cartagena's complaint fails to satisfy either prong. Cartagena's allegations establish no protected liberty interest; the policy that Cartagena relies upon does not support his claim. And, in any event, Cartagena's pleadings show that he was given post-deprivation notice and an opportunity to respond: he was told the reasoning behind his placement in SDTP and had many opportunities to challenge that decision.

## A. Cartagena failed adequately to allege a protected interest

First, Cartagena failed adequately to allege a protected interest. A liberty interest "may arise from the Constitution itself, by reason of guarantees implicit in the word liberty, or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). This Court has held that "convicted prisoner[s] . . . do[] not have an inherent, constitutionally protected liberty interest in release from solitary confinement." *Smith v. Collins*, 964 F.3d 266, 275 (4th Cir. 2020). Accordingly, Cartagena must identify a "state-created liberty interest." *Prieto*, 780 F.3d at 248; see also

Cartagena Br. 32–39 (arguing that Cartagena has a "liberty interest in avoiding solitary confinement conditions" based on VDOC policies).

To identify a state-created liberty interest in avoiding his confinement, Cartagena must show two things: (1) that there is a "basis for an interest or expectation in state regulations for avoiding such confinement"; and (2) that "the conditions impose atypical and significant hardship in relation to the ordinary incidents of prison life." *Smith*, 964 F.3d at 275 (cleaned up). Cartagena fails at both steps.

Cartagena does not contend that any Virginia statute or regulation provides a basis for an expectation in avoiding placement in SDTP. Rather, he contends that VDOC Operating Procedure 841.4 "provides that incarcerated people with serious mental illness shall not be held in solitary confinement units for more than 28 days." Cartagena Br. 33. With strategically-placed brackets, he contends that the policy states "SMI . . . inmates must be moved out of [*segregation units*] within 28 days . . . ." Cartagena Br. 28 n.4 (emphasis added). In fact, the policy actually provides that inmates with serious mental illnesses "must be moved out of *RHU status* within 28 days of the inmate's initial placement on general

39

detention," unless an exemption is granted. Operating Procedure 841.4 at 7 (emphasis added); see pp.9–10, *supra*.

The same policy makes clear that SDTP is *not* RHU status. Operating Procedure 841.4 at 4 (defining RHU and SDTP distinctly); see p.9, *supra*. Although an inmate cannot remain in RHU for more than 28 days without an exception, a similar temporal limitation does not apply to SDTP. See pp.9–10, *supra*. In fact, the policy provides that inmates who reach the time limit in RHU status can then be moved to SDTP: if a seriously mentally ill inmate cannot be released into the general population after 28 days because he "frequently engages in assaultive, disruptive, and/or unmanageable behaviors," he can instead be referred to SDTP. See p.10, *supra*. Cartagena never alleges that he was held in an RHU for more than 28 days; indeed, he alleges that he was kept "for 18 months straight within the SDTP unit." JA69. Thus, the only state regulation to which Cartagena points does not create "an interest or expectation . . . for avoiding such confinement." *Smith*, 964 F.3d at 275. The district court correctly held that Cartagena did not "point to any

VDOC procedure under which he enjoyed an 'interest or expectation' in avoiding *SDTP confinement*." JA100 (emphasis added).

Cartagena's complaint also does not establish that SDTP imposed atypical and significant hardship compared to the ordinary incidents of prison life. *Smith*, 964 F.3d at 275. Again, SDTP features conditions not unlike the typical incidents of prison life: offenders can participate in social groups, experience religious services, and engage in structured social activity. See pp.8–9, *supra*. Although there are "structured security regulations and procedures," Operating Procedure 841.4 at 4, the addition of certain regulations and procedures for inmates who have serious mental illnesses and have engaged in assaultive, disruptive, and/or unmanageable behaviors is not atypical. See, *e.g.*, *Williams v. Branker*, 462 Fed. Appx. 348, 351, 355 (4th Cir. 2012) (affirming judgment on the pleadings of claim that prisoner was "punished with atypical and significant hardships" by holding that the "conditions of [the prisoner's] confinement appear designed to limit his ability and

opportunity to inflict harm on himself or others, rather than intended to exacerbate his medical condition").

In addition, although for a portion of Cartagena's time in SDTP, social gatherings were suspended due to the COVID-19 pandemic, that preventative measure was not unique to SDTP; rather, it was implemented throughout River North at the time to slow the spread of infection. See pp.11–12, *supra*. It was therefore not an atypical and significant hardship in relation to the ordinary incidents of prison life in the midst of a serious global pandemic. *E.g.*, Joseph Shapiro, *As COVID-19 Spreads in Prisons, Lockdowns Spark Fear of More Solitary Confinement*, NPR (June 15, 2020), https://tinyurl.com/3w6xu9dt.

The cases to which Cartagena attempts to draw parallels, therefore, fall short. See Cartagena Br. 35–37. Both involved RHU, not SDTP. Compare p.9, *supra* (defining RHU as a "operat[ing] under maximum security regulations and procedures") and Operating Procedure 841.4 at 4 (describing the "RH Step-Down 1" and "RH Step-Down 2") with *Incumaa v. Stirling*, 791 F.3d 517, 521 (4th Cir. 2015) ("Due to his role in the 1995 riot, [the defendant] was . . . placed in the Maximum Security

Unit."), and *Thorpe*, 37 F.4th at 931 (discussing the pathways offered in the RHU Step Down program).

The conditions in SDTP are unlike those in *Incumaa* and *Thorpe*. In those cases, the inmates were "denie[d] . . . all productive activities," *Thorpe*, 37 F.4th at 931, had "an inability to socialize with other inmates," *Incumaa*, 791 F.3d at 531, and were locked down in their cells for the vast majority of the time, *e.g.*, *id.* at 522; *Wilkinson*, 545 U.S. at 214; *Thorpe*, 37 F.4th at 942. By contrast, in SDTP offenders can participate in social groups and experience religious services inside their assigned cell at all times, with "structured social activity increas[ing]," including that "offenders may attend religious services" communally, as the inmate progresses through the program. See pp.8–9, *supra*.

The district court correctly dismissed Cartagena's due process claim because the complaint does not adequately plead the existence of a liberty interest.

### B. By his own allegations, Cartagena received all the process he is due

As the district court noted, "[t]here is no need to examine what process is due if the plaintiff fails to identify a constitutionally protected interest." JA96–97 (citing *Wilkinson*, 545 U.S. at 221). Here, as discussed

43

above, Cartagena has failed to identify a constitutionally protected interest. This Court therefore need not decide what process Cartagena was due. In any event, defendants granted more process than the Constitution requires.

Cartagena alleged that he was deprived of due process because he was not provided notice or a right to appeal his detention; given the right to attend, make testimony, defend, or provide witnesses against detention; or allowed an opportunity to opt out of treatment. JA65. But *Thorpe* noted the lack of precedents holding that inmates are entitled to "discrete procedures like advance notice, an opportunity to offer witnesses, or a possibility of appeal." *Thorpe*, 37 F.4th at 944. Rather, inmates are entitled to the "elementary requirements" of due process: "Supreme Court precedent requires at minimum that prisoners receive information at some point as to why a change in security status is being recommended as well as an opportunity to respond." *Id.* at 945 (quotation marks omitted).

According to his own allegations and information subject to judicial notice, Cartagena received much more than that bare minimum. According to VDOC procedure, to initiate the SDTP review process, an

institutional employee schedules and conducts an ICA hearing; the offender receives formal notification of the hearing and has a right to be present.[6] See p.6, *supra*. Further, Cartagena's pleadings make clear that he received post-deprivation notice as to why he was placed in SDTP, and an opportunity to respond through the informal complaint and grievance process.

Specifically, Cartagena was told that he had been referred to SDTP due to his inability to function in the general population; in addition, he met the criteria for serious mental illness and had frequently engaged in assaultive, disruptive, and/or unmanageable behaviors. See pp.13–14, *supra*. And Cartagena was given an opportunity to respond to that information; indeed, he responded over a dozen times in his various complaints and grievances. See p.13, *supra*. Cartagena's complaint demonstrates that he received what due process requires: "information *at some point* as to why a change in security status is being

---

[6] Although Cartagena fails to mention the ICA hearing in his complaint allegations or exhibits, defendants note for context that he was in fact given the advance notice and opportunity to respond that he contends should be provided: on November 21, 2019, Cartagena was notified of his ICA hearing but refused to sign the form. He was then notified again, waived his right to the 48-hour notice period, and indicated that he did not wish to attend the hearing.

recommended," and an opportunity to respond. *Thorpe*, 37 F.4th at 945 (emphasis added).

Contending that "neither the Supreme Court nor this Court has articulated the exact process prisoners must receive," Cartagena Br. 39 (quotation marks omitted), Cartagena points to the three-pronged framework in *Mathews v. Eldridge*, 424 U.S. 319 (1976). But *Mathews* does not support Cartagena. *Mathews* provides that "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner"; it does not uniformly require a pre-deprivation hearing. *Id.* at 333 (quotation marks omitted). And, as Cartagena concedes, "the Supreme Court [has] deemed the process sufficient where there were multiple levels of review, and prisoners received notice of the factual basis leading to consideration for solitary confinement and a fair opportunity for rebuttal." Cartagena Br. 41 (cleaned up) (quoting *Wilkinson*, 545 U.S. at 225–26). Offenders are assigned to SDTP only after VDOC engages in precisely that sort of multi-layered review process. See pp.5–8, *supra*. Cartagena received notice of the factual basis for his placement in SDTP and a fair

opportunity for rebuttal through the complaint and grievance process. See pp.13–14, *supra*.

In addition, the third *Mathews* factor weighs against Cartagena because the government has a strong interest in "maintain[ing] order and security" in prisons. See Cartagena Br. 42 (quoting *Incumaa*, 791 F.3d at 535). Cartagena contends that interest is irrelevant here, because "the primary reason for Mr. Cartagena's placement in the SDTP was not for safety and security but because of his serious mental illness." *Id.* at 43. But that is not accurate. Cartagena was transferred to SDTP not only because he met "the criteria for Serious Mental Illness," but also because he "often engage[d] in assaultive, disruptive, and/or unmanageable behaviors." JA29. VDOC policy does not permit a transfer to SDTP solely on the basis of a mental illness. See p.5, *supra*. Thus, the primary reason for Cartagena's placement in SDTP *was* safety and security—his conduct in the general population put himself and others at risk, and disrupted prison security. And, of course, VDOC is under a constitutional obligation to protect inmates from violence committed by other inmates. See

*Farmer*, 511 U.S. at 833; *Makdessi*, 789 F.3d at 132. The district court correctly dismissed Cartagena's procedural due process claim.

### III. The district court correctly held that Cartagena failed to state an ADA or RA claim

Finally, Cartagena failed adequately to allege an ADA or RA claim. Cartagena has not adequately alleged that he was removed from the general population or other less restrictive settings on the basis of his disability. Rather, Cartagena's pleadings make clear that he was not otherwise eligible for the general population due to his committing assaults and disruptive behavior.

To state a claim under either the ADA or the RA, a plaintiff must allege that he "has a disability," is "otherwise qualified to receive the benefits of a public service, program, or activity," and "was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of her disability." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005). Cartagena's complaint fails adequately to allege facts satisfying these requirements.

The district court correctly held that "[e]ven assuming that [Cartagena's] mental health issues could qualify as a disability under

48

[the ADA and RA]," Cartagena did not allege "facts indicating that, due to this disability, the defendants deprived him of benefits for which he was otherwise qualified." JA102. As Cartagena argues, a "plaintiff is otherwise qualified when a disability is the *only* reason for denying participation in a service, program, or activity." Cartagena Br. 54 (citing *Fauconier v. Clarke*, 966 F.3d 265, 277 (4th Cir. 2020)) (emphasis added).

The documents Cartagena attached to his complaint show that he was not, in fact, otherwise qualified "to remain in general population or another less restrictive setting." Cartagena Br. 53. Cartagena contends on appeal that the "complaint contains no facts indicating he was removed from the general population and assigned to the SDTP for any reason other than his disability." Cartagena Br. 54. But the exhibits to the complaint demonstrate that VDOC officials made clear that Cartagena was not removed from the general population due to his disability, but rather "referred to the SDTP program by the MITT team due to [his] inability to function in G[eneral] P[opulation]." JA46. VDOC officials also explained that offenders are not referred to SDTP solely because they have a mental illness. Rather, offenders are placed in SDTP "because they meet the criteria for Serious Mental Illness *and* they often

49

engage in assaultive, disruptive and/or unmanageable behaviors." JA29 (emphasis added). Indeed, VDOC procedures do not permit transfer to SDTP unless an inmate is *both* "designated as Seriously Mentally Ill (SMI)" *and* "frequently engage[s] in assaultive, disruptive, and/or unmanageable behaviors." Operating Procedure 730.3 at 10.

Cartagena's history of assaults and disruptive behavior, and his inability to function in the general population, demonstrate that he was not "otherwise qualified" for the general population. See *Fauconier*, 966 F.3d at 277; *Doe v. University of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1265 (4th Cir. 1995) ("[A]n individual is not otherwise qualified if he poses a significant risk to the health or safety of others by virtue of the disability that cannot be eliminated by reasonable accommodation."); see also *Palmer v. Circuit Ct. of Cook Cnty., Ill.*, 117 F.3d 351, 352 (7th Cir. 1997) (finding that, because "the ADA "protects only 'qualified' employees [and] . . . threatening other employees disqualifies one," the employer did not violate the ADA when it fired an employee who "threatened to kill another employee" as a result of "her mental illness").

Second, for similar reasons, Cartagena failed to allege facts showing that he was excluded from the general population *on the basis*

*of* his disability. Cartagena contends that defendants discriminated against him on the basis of his disability because they "segregat[ed] him in a highly restrictive unit exclusively for people with mental disabilities." JA57. But again, Cartagena was not removed from the general population because of his serious mental illness. He was removed from the general population because he frequently engaged in assaultive, disruptive, and/or unmanageable behaviors. JA29. A prisoner without a serious mental illness who engaged in such misconduct would be placed in restrictive housing. See Operating Procedure 841.4 at 5 (inmate placed in RHU when "their presence in the general population . . . poses a direct threat to the inmate, other inmates, institutional staff, or a clear threat to the safe, secure operation of the institution"). Cartagena was instead given the benefit of SDTP, a special treatment program which would provide needed mental healthcare.

Therefore, inmates are not transferred to SDTP "on the basis of [their] disability," but because their conduct makes them unable to function in less restrictive settings without endangering themselves or others, or impairing the safe and orderly management of the prison. See, *e.g.*, *Doe*, 50 F.3d at 1265–66 (finding that an HIV-positive doctor "pose[s]

51

a significant risk to the health and safety of his patients that cannot be eliminated by reasonable accommodation" and "therefore conclud[ing] that [he] is not an otherwise qualified individual with a disability under § 504 of the Rehabilitation Act and the ADA"); see also, *e.g.*, *Lai v. New York City Government*, 163 F.3d 729 (2d Cir. 1998) (per curiam) (city policy giving more favorable allocation of "handicap parking spaces" to "applicants who [had] a severe handicap" and who lived or worked in the city did not violate the ADA because it "discriminates on the basis of residency and not disability").

This case is thus also unlike *Fauconier v. Clarke*, 966 F.3d 265 (4th Cir. 2020). There, the inmate "performed various jobs" both "competently and without any accommodation" while in prison for years. *Fauconier*, 966 F.3d at 270 (cleaned up). But he suffered from a disease that occasionally required his hospitalization. On one occasion, VDOC did not allow him to resume his job following a hospitalization, "on the basis that the 'Work Code D' medical classification that had been assigned to him prior to th[at] hospitalization precluded his employment in *any* prison job." *Ibid.* This Court held that "VDOC officials denied [the inmate] prison employment because they regarded him as disabled," and

52

"conclude[d] that [he] plausibly alleged a violation of . . . the ADA." *Id.* at 277. Here, again, Cartagena was not placed in SDTP simply because prison officials regarded him as disabled. Rather, prison officials determined that Cartagena could not function in the general population because he "frequently engage[d] in assaultive, disruptive, and/or unmanageable behaviors." See p.10, *supra*; see also JA29; Operating Procedure 730.3 at 10 (same).

The allegations thus do not satisfy the ADA's causation requirement. They are even more deficient under the higher RA causation standard. To succeed on a claim under the RA, the plaintiff "must establish he was excluded '*solely* by reason of' his disability." *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 462 (4th Cir. 2012) (quoting *Baird ex rel. Baird v. Rose*, 192 F.3d, 462, 468 (1999)). Cartagena plainly cannot meet that standard, because serious mental illness was only one of the factors MITT considered in placing inmates in

SDTP. The district court correctly held that Cartagena failed adequately to plead a claim under the ADA or RA.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's decision granting defendants' motion to dismiss.

Respectfully submitted,

ALLIE LOVELL, *et al.*

By: ___*/s/ Kevin M. Gallagher*___
Kevin M. Gallagher
*Deputy Solicitor General*

JASON S. MIYARES
*Attorney General*

DIANE M. ABATO
*Senior Assistant Attorney General*

D. PATRICIA WALLACE
*Assistant Attorney General*

ANDREW N. FERGUSON
*Solicitor General*

ERIKA L. MALEY
*Principal Deputy Solicitor General*

ANNIE CHIANG
*Assistant Solicitor General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile

*Counsel for Defendants-Appellees*

April 20, 2023

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 10,180 words, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century typeface.

*/s/ Kevin M. Gallagher*
Kevin M. Gallagher

## CERTIFICATE OF SERVICE

I certify that on April 20, 2023, I electronically filed the foregoing brief with the Clerk of this Court by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

*/s/ Kevin M. Gallagher*

Kevin M. Gallagher