**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

—————————

**No. 22-7279**

—————————

ANGEL CARTAGENA,

                    Plaintiff – Appellant,

        v.

ALLIE LOVELL, Director of all Secure Diversionary Treatment Program; T.
DOWELL, Unit Manager of S.D.T.P. Unit A-1; B. KANODE, Warden of River
North Correctional Center; KILBOURNE, Chief of Housing and Programming; DR.
HAYNES, Psychiatrist over S.D.T.P. Unit; CHADWICK DOTSON, Director of
Virginia Department of Corrections; DAVID ROBINSON, C.C.O. of the Virginia
Department of Corrections; ERIC MADSEN, In charge of Institutional
Classification; CARL MANIS, Regional Administrator of the Western Region,

                    Defendants – Appellees.

------------------------------------------------

PROFESSORS   AND   PRACTITIONERS   OF   PSYCHIATRY   AND
PSYCHOLOGY,

                    Amicus Supporting Appellant.

—————————

Appeal from the United States District Court for the Western District of Virginia, at
Roanoke.  Robert S. Ballou, Magistrate Judge.  (7:21-cv-00539-RSB)

—————————

Argued:  January 24, 2024                        Decided:  May 24, 2024

—————————

Before NIEMEYER, AGEE, and THACKER, Circuit Judges.

—————————

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Agee joined. Judge Thacker wrote a dissenting opinion.

———————————

**ARGUED:** Jennifer A. Wedekind, AMERICAN CIVIL LIBERTIES UNION, Washington, D.C., for Appellant. Kevin Michael Gallagher, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees. **ON BRIEF:** Marisol Dominguez-Ruiz, AMERICAN CIVIL LIBERTIES UNION, San Francisco, California, for Appellant. Jason S. Miyares, Attorney General, Diana M. Abato, Senior Assistant Attorney General, D. Patricia Wallace, Assistant Attorney General, Andrew N. Ferguson, Solicitor General, Erika L. Maley, Principal Deputy Solicitor General, Annie Chiang, Assistant Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees. Michael P. O'Day, Baltimore, Maryland, Jacob Frasch, Washington, D.C., Andrew P. Valentine, DLA PIPER LLP (US), East Palo Alto, California, for Amici Curiae.

NIEMEYER, Circuit Judge:

Angel Cartagena, an inmate in the Virginia Department of Corrections (VDOC) prison system, challenges the conditions of his 18-month confinement at the River North Correctional Center, alleging that his confinement was too restrictive and caused him emotional distress and severe mental anguish, in violation of his First, Eighth, and Fourteenth Amendment rights, as well as statutory prohibitions against discrimination. Because VDOC officials determined that Cartagena was seriously mentally ill, as well as assaultive, disruptive, and/or unmanageable and thus unable to function in the general prison population, they assigned him to the VDOC's Secure Diversionary Treatment Program (SDT Program), which was offered at the River North facility. Under the Program, an inmate is initially separated from the prison population and given treatment with the ability, by compliance with the treatment offered, to progress from restricted conditions to out-of-cell time and social activities. Cartagena, however, refused to comply with the treatment regimen prescribed for him and complained of the consequential restrictions of the Program. He also refused to receive medical treatment as needed, and 18 months into his stay at River North, he attempted suicide. After two more suicide attempts at a more secure facility, Cartagena was committed to the prison system's hospital at Marion Correctional Treatment Center for intensive mental care.

The district court granted the prison officials' motion to dismiss Cartagena's complaint, concluding that Cartagena had failed to state plausible claims for relief by failing to sufficiently allege (1) a deliberate indifference by prison officials to his condition,

(2) the deprivation of a constitutionally protected liberty interest, and (3) discrimination because of his disability.

For the reasons that follow, we affirm.

I

The VDOC operates a large prison system that includes a wide range of institutions with different levels of restrictions and inmate treatment. Some are high security facilities, reserved for inmates who have a history of behavioral problems and who were convicted of crimes for which they are serving life sentences. Others are relatively low security facilities, appropriate for inmates serving shorter sentences for less serious crimes and without a history of behavioral problems or prison escapes. In assigning inmates to these various institutions, the VDOC seeks "to provide the appropriate level of security [that] enhances public, staff, and inmate safety and reduces the operating cost of the [VDOC] by ensuring inmates are not subjected to excessive control and management but are assigned to the least restrictive security level necessary." Va. Dep't. of Corr., Operating Procedure 830.2, at 4 (eff. Oct. 1, 2021). Pursuant to that policy, the VDOC also operates institutions dedicated to the confinement of inmates with "serious mental illnesses." In particular, for "seriously mentally ill" offenders who also "frequently engage in assaultive, disruptive, and/or unmanageable behaviors," it offers a Secure Diversionary Treatment Program (SDT Program) at River North Correctional Center that "provides [inmates] treatment in a secure setting." Operating Procedure 730.3, at 7 (eff. Mar. 1, 2018). That Program "operates within structured security regulations and procedures, and provides for programming and

4

treatment services conducive with evidence based treatment protocols and individualized treatment plans." *Id*. at 2. At River North, the SDT Program includes two sub-programs — the Enhanced Prosocial Interaction Community (EPIC) and the Secure Communicative and Reintegration Environment (SCORE). The SCORE unit is the more restrictive of the two. As VDOC officials explain, offenders housed there begin in a relatively restricted environment but can progress to "gradual out of cell time for both structured therapeutic and unstructured activities on the unit." And they may also "participate in social groups for recreation, programming, and social activities." By contrast, when offenders progress to the EPIC unit, "structured social activity increases" further and, for example, "offenders may attend religious services." In short, the two sub-programs are designed to provide treatment by which the inmate can graduate to greater integration into the prison population.

Beginning in November 2019, Cartagena was assigned to the SDT Program at River North because he was determined to be seriously mentally ill and unable to live in the prison population without engaging in assaultive, disruptive, or unmanageable behavior. During his 18-month stay at River North, Cartagena filed numerous grievances, including complaints about the restrictions on his conditions of confinement and the mental anguish he was suffering, ultimately leading to his attempts to commit suicide. After a short stop at a higher security facility, Cartagena was transferred to Marion Correctional Treatment Center for intensive mental health treatment. After his transfer to Marion, Cartagena commenced this action pro se against VDOC officials, complaining about the conditions of his confinement at River North.

In his amended complaint, Cartagena alleged that since the age of 12, he had "been on psychotropic medicines for his serious mental disabilities," including borderline personality disorder, anti-social personality disorder, schizo-affective disorder, schizophrenia, and bipolar disorder Type II. As such, he stated, "he suffers from serious mental illnesses," and the defendants were so aware, having placed him "involuntarily" in the SDT Program without a judicial order. He alleged that he was unlawfully detained in the Program for 18 months, beginning November 22, 2019, and that the Program was "one of the most restrictive units within the [VDOC] which was extremely deleterious to [his] health and safety." As he stated, "Being isolated for a long period of (18) months and (5) days exact was very insalubrious to [his] mental health and safety." As he detailed the conditions,

> In this program offenders are never unrestrained, unless offenders are within their cells. Anytime offenders come out [of] their cells, they are fully strip[] searched and then placed in handcuffs with a dog leash attached to them and also placed in shackles, then escorted by (2) officers at all times. Anytime offenders come out [of] their cells for programming, which is within the designated area in the pod, offenders are then handcuffed and shackled to tables called (S)ecured Chairs. Whenever offenders have outside recreation, offenders are caged in segregation recreation cages. If offenders are sent to medical, the offender is handcuffed and shackled, with a dog leash attached to the handcuffs, then to be escorted by (2) officers under segregation restrictive movement. Offenders within the (S)ecure Diversionary Treatment Program unit cannot be anywhere near other offenders outside the S.D.T.P. unit. Offenders are not allowed to attend religious services, [and] this was before the COVID epidemic even began. Offenders are not even allowed to have a job.

He also alleged in some detail his April 24, 2021 suicide attempt at River North. He recounted how he first swallowed a toothpaste tube and then electrical wiring to choke himself. He then began cutting his forearms with a razor. After having second thoughts,

6

he called to an officer near his cell, and the officer called a supervisor and a nurse, who stated that he needed to be taken to the hospital to address the wound to his arm. Once he arrived at the hospital, however, Cartagena refused medical treatment and he was returned to River North, where he was placed in five-point restraints. Later that same day, the toothpaste tube and electrical wiring in his stomach began to cause him immense pain. When he alerted the nurse on call to the situation, he was again taken to the hospital. This time, however, he agreed to receive treatment, and the objects were surgically removed from his stomach.

Finally, Cartagena alleged that after his stay at River North, he was transferred for three months to Wallens Ridge State Prison, where he was subject to "extreme restrictions" and where he attempted to commit suicide two more times. Then on August 31, 2021, he was committed to a medical hospital, Marion Correctional Treatment Center, for "intensive care for his serious mental health needs."

To demonstrate his exhaustion of prison procedures, Cartagena attached to his complaint numerous grievances he had filed with prison officials, complaining about his conditions of confinement, as well as the officials' responses. For example, in response to one of his complaints that the SDT Program was "not designed for the [seriously mentally ill]" and that prison officials had "failed to take necessary steps to ensure the safety of [his] mental stability," an official responded:

> The Secure Diversionary Treatment Program is designed with [Seriously Mentally Ill] offenders in mind. Offenders are placed in the Secure Diversionary Treatment Program because they meet the criteria for Serious Mental Illness and they often engage in assaultive, disruptive, and/or unmanageable behaviors. Every effort will be made to manage their

behaviors within the units.  If the offender continues to endanger others due to assaultive or destructive behavior after other interventions have been tried, including use of restraints or placement in an observation room as set forth in Operating Procedure 420.2, the offender may be reclassified to Restrictive Housing according to Operating Procedure 425.4.

In response to another similar grievance, which included a complaint about restrictions on his religious exercise, the official responded:

Offenders housed in the SCORE unit experience a process of gradual out of cell time for both structured therapeutic and unstructured activities on the unit.  As an offender progresses through the program, and from phase to phase, the offender will also experience an increase in social activities.  In SCORE, similar to [restrictive housing], offenders experience religious services inside their assigned cell; they may contact the chaplain for religious guidance, study materials, and to participate in seasonal activities.  As structured social activity increases into the EPIC unit, offenders may attend religious services.

And in response to yet another complaint about his assignment to the SDT Program, the official responded:

The process of being assigned to the Diversionary Treatment Program is a Multi-Institutional Treatment Team decision.  Once criteria for [Serious Mental Illness] are met, the offender is further reviewed to determine the appropriate SDTP program of housing and treatment to best meet the offender's needs.  You have been assigned to the program *because you meet the criteria* and are a Seriously Mentally Ill (SMI) offender.

(Emphasis added).

In one lengthy grievance, Cartagena complained that to "be free from isolation in SCORE Unit" of the SDTP, he "was forced to complete programming" and had to "comply with treatment" against his will.  He also pointed out that if inmates "don't comply with the treatment recommendations, [they] are forced to remain in total isolation."  A VDOC official again responded in a manner similar to other responses, and at one point, an official

8

told Cartagena that "[y]ou were referred to the SDTP program by the [Multi-Institutional Treatment Team] due to your inability to function in [the] G[eneral] P[opulation]. You are free to refuse any and all programming. You do not, however, decide where you are housed."

At the conclusion of his complaint, Cartagena requested $80,000 in damages, as well as an injunction ordering the defendants "to never ever again detain him . . . in the (S)ecure Diversionary Treatment Program unit ever again."

The defendants filed a motion to dismiss Cartagena's complaint for failure to state plausible claims for relief, pursuant to Federal Rule of Civil Procedure 12(b)(6). And the district court granted the motion in full.

In disposing of Cartagena's First Amendment claim, the district court pointed out that his complaint did not assert "how failure to attend religious services in person put substantial pressure on him to violate his religion." The court noted that the SDT Program did not prevent him from "practicing his religious faith in other ways, such as watching religious services on television, reading religious texts, and praying in his cell." Because the complaint failed to allege the requirements of a First Amendment claim in the prison context, the court dismissed it, relying on *Turner v. Safley*, 482 U.S. 78, 89 (1987). In disposing of Cartagena's Eighth Amendment claim, the court noted that the complaint did not allege that VDOC officials had deprived Cartagena of medical or mental health care. And it concluded further that Cartagena's allegations did not sufficiently establish that prison officials "knew the SDTP living conditions themselves would pose a threat to Cartagena's health or safety" because "Cartagena's submissions indicate[d] that the SDTP

unit [was] designed for inmates like himself, who ha[d] been diagnosed with [a serious mental illness] and who ha[d] not functioned well in other types of VDOC housing." Thus, the court concluded, Cartagena's allegations were "not sufficient to support a finding that [the defendants] were deliberately indifferent to Cartagena's mental health needs or safety." In disposing of Cartagena's Fourteenth Amendment due process claim, the court concluded that his detention in the SDT Program did not trigger "a liberty interest protected under the Due Process Clause," reasoning that the requirements for establishing such a liberty interest were not satisfied and citing *Smith v. Collins*, 964 F.3d 266, 275 (4th Cir. 2020). Finally, with respect to Cartagena's claims under the Americans with Disabilities Act and the Rehabilitation Act, the court concluded that Cartagena had failed to sufficiently allege discrimination on account of his disability. As the court noted, he failed to allege facts "indicating that, due to his disability, the defendants deprived him of benefits for which he was otherwise qualified."

Represented by counsel, Cartagena filed this appeal, contending that the district court erred in dismissing his Eighth and Fourteenth Amendment claims, as well as his two statutory discrimination claims.

## II

Cartagena contends first that he sufficiently pleaded an Eighth Amendment violation related to his assignment to the SDT Program. He argues that the defendants obviously knew of his mental illness and the harm that the SDT Program was causing him, claiming that it amounted to a "solitary confinement condition[]." And he maintains

further that because the defendants had knowledge of the harm the SDT Program was causing him, his continued detention for 18 months in the Program amounted to deliberate indifference to his mental health, in violation of his Eighth Amendment rights.

Yet, even accepting Cartagena's characterizations about the defendants' knowledge of his confinement and the harm that it caused, he nonetheless falls short of plausibly alleging the culpable mens rea requirement for an Eighth Amendment violation. Indeed, Cartagena cannot satisfy the mens rea requirement because the VDOC officials undisputedly offered Cartagena treatment to help him and protect other inmates, but he refused it.[*]

---

[*] Our good colleague in dissent grounds her main argument in response to our opinion on the asserted absence of any allegation that Cartagena refused to comply with the SDT Program. But respectfully, we believe that the record repeatedly refers to his refusal.

In his complaint, Cartagena alleged that the SDT Program was "a li[c]ensed psychiatric unit funded by the Federal Government," which provides treatment and benefits with a lessening of restrictions if the inmate complies with the Program. He alleged that if inmates "don't comply with the treatment recommendation, [they] are forced to remain in total isolation." VDOC officials described the progressive aspect of the Program, and, indeed, Cartagena alleged that from time to time he complied with the Program — albeit against his will — and thus progressed to the EPIC unit, where social activities increased. But his complaint was not directed at the conditions in the EPIC unit. To support his claims, he focused on the restrictive conditions in the SCORE unit, which he described in detail, implying that he had not, at the times he was in the SCORE unit, complied with the treatment entitling him to progress to less restrictive conditions.

And Cartagena alleged his noncompliance with treatment explicitly. His Eighth Amendment claims are grounded in the fact that providing him treatment against his will — *i.e.*, despite his refusal to comply — violated his constitutional rights. He alleged that he was "denied the opportunity to *not* participate in mental health treatment, care, and services." (Emphasis added). He alleged, "I was placed in S.D.T.P. against my own will. I have *the very right to refuse* treatment." (Emphasis added). He alleged, "Anybody who doesn't comply with treatment are forced to remain in the S.D.T.P. S.C.O.R.E. unit against the[ir] own will." He alleged, "I have the very right *to refuse treatment*, but members of (Continued)

The Eighth Amendment prohibits the "inflict[ion]" of "cruel and unusual punishments." U.S. Const. amend. VIII. And it is well established that "the conditions under which [a prisoner] is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 31 (1993). But such scrutiny "does not mandate comfortable prisons," instead permitting conditions that are "restrictive and even harsh." *Rhodes v. Chapman*, 452 U.S. 337, 349, 347 (1981). The right protects against "inhumane ones" imposed with a sufficiently culpable mens rea. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

The *Farmer* Court noted that prison officials violate the Eighth Amendment when two requirements are met. "First, the deprivation alleged must be, objectively, sufficiently serious," denying "the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834 (cleaned up). Second, because only the *unnecessary and wanton* infliction of pain implicates the Eighth Amendment, a prisoner must show that prison officials also had a "sufficiently culpable state of mind." *Id.* (cleaned up). And in a case challenging prison

---

the M.I.T.T. have violated my civil rights repeatedly by forcing me to remain in this unit." (Emphasis added). He alleged, "Dr. Haynes stated . . . that *I am free to refuse* any and all programming, but if I did just that I would be placed back into the S.C.O.R.E. unit indefinitely. . . . To enforce treatment against my own will is unlawful and unconstitutional." (Emphasis added). And when he was taken to the hospital, he alleged that he also "refused medical treatment" there. In response to these allegations, prison officials responded, as Cartagena also alleged, "You were referred to the SDTP program by the MITT team due to your inability to function in [general population]. *You are free to refuse* any and all programming. You do not, however, decide where you are housed." (Emphasis added).

In sum, the essence of Cartagena's complaint is that it violates the Eighth Amendment to impose consequences on him for his refusal to comply with his prescribed treatment protocol. The inevitable conclusion from such a claim is that he did indeed refuse treatment.

conditions, that state of mind must be at least "deliberate indifference" to the inmate's "health or safety." *Id*. (cleaned up); *see also Porter v. Clarke*, 923 F.3d 348, 361 (4th Cir. 2019); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016).

"Deliberate indifference," as the *Farmer* Court explained, is a culpable mens rea that requires proof that the prison official subjectively "*kn[e]w* of and *disregard[ed]* an excessive risk to inmate health or safety." 511 U.S. at 837 (emphasis added). Thus, to show that a prison official was deliberately indifferent, the prisoner must show that the official "*consciously disregard[ed]* a substantial risk of serious harm," which the Court adopted from the definition of criminal recklessness in the Model Penal Code. *Id*. at 839 (emphasis added) (cleaned up).

Cartagena did not sufficiently plead nor does he persuasively argue that he has demonstrated the required mens rea, nor could he.

Prison officials knew that Cartagena had a serious mental illness and also that he was incapable of functioning in the general prison population. As Cartagena alleges, *to address these conditions* — both in the interest of the prison population and Cartagena's own mental health — a panel of prison officials determined, in their expertise, that Cartagena's conditions would best be addressed by assigning him to the SDT Program, which is a "formalized program" that operates under "structured security" procedures and provides "programming and treatment services" and "individualized treatment plans." Operating Procedure 730.3, at 2 (eff. Mar. 1, 2018). Thus, the Program initially removes the inmate from the prison population, provides him with treatment, and adopts a plan, the compliance with which entitles the inmate to increased social interaction with the prison

13

population. Indeed, inmates are "allowed to participate in social groups for recreation, programming, and social activities." Thus, under this arrangement, Cartagena was given control over the removal of restrictions and the increase of social activity by complying with the Program. Yet, as he alleged, he refused to do so, apparently disagreeing with the program and treatment that, as his complaint recognized, a panel of experienced prison officials had determined was best suited for him given his condition and the general prison population. These allegations establish that, rather than being deliberately indifferent to Cartagena's condition, the VDOC officials assessed it and addressed it with a program designed to benefit both him and the prison population.

Moreover, when Cartagena attempted to commit suicide, prison officials reacted promptly, immediately giving him medical treatment and ultimately transferring him to Wallens Ridge and then to Marion for intensive mental health care.

At bottom, these allegations show the opposite of "deliberate indifference." The SDT Program was a nuanced one with the carrot of treatment and benefits and the stick of restriction. The defendants responded to Cartagena's conditions and sought to address them with treatment while, at the same time, imposing restraint to protect the prison population. The fact that Cartagena did not agree with the treatment can hardly be attributed to a criminal recklessness on the part of prison officials. Cartagena's allegations are not the stuff of deliberate indifference, as is required to be shown for an Eighth Amendment claim.

14

III

Next, Cartagena contends that the district court erred in dismissing his Fourteenth Amendment claim because, as he argues, VDOC officials, without due process, deprived him of a liberty interest, in violation of the Fourteenth Amendment. He maintains that VDOC prison regulations gave rise to an expectation of avoiding placement in "solitary confinement units" and that the conditions of such confinement were "harsh and atypical in relation to the ordinary incidents of prison life," citing *Thorpe v. Clarke*, 37 F.4th 926, 942 (4th Cir. 2022) and *Incumaa v. Stirling*, 791 F.3d 517, 527, 531–32 (4th Cir. 2015), such that he had a cognizable liberty interest created by state regulation. *See Wilkinson v. Austin*, 545 U.S. 209, 221–24 (2005). He argues that this conclusion is supported by (1) the magnitude of his isolation, which was similar to that recognized in *Thorpe* and *Incumaa*; (2) the length of his confinement in the SDT Program, which was more than 550 days and which "could have been indefinite"; and (3) the fact that good-time credits could be affected if, as he alleged in his complaint, he "failed to cooperate, participate or not complete S.D.T.P.'s mental health treatment, services, care, [and] assignments." Cartagena also claims that his liberty interest was deprived without due process, primarily without "notice of the case against him and opportunity to meet it," quoting *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976).

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. To establish that a government actor violated this proscription, "a plaintiff must (1) identify a protected liberty or property interest and (2) demonstrate deprivation of that interest

without due process of law." *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015). A liberty interest "may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Wilkinson*, 545 U.S. at 221 (citations omitted). But because the Supreme Court has already held that the Constitution itself does not give rise to a liberty interest in avoiding transfer to a more adverse condition of confinement, *see Meachum v. Fano*, 427 U.S. 215, 225 (1976), we must look to state law to determine whether it provides a liberty interest in the context of this case.

To determine whether state law provides such an interest, a two-step analysis is required, under which the prisoner must "[1] point to [state] law or policy providing him with an expectation of avoiding the conditions of his confinement *and* [2] demonstrate that those conditions are harsh and atypical in relation to the ordinary incidents of prison life." *Prieto*, 780 F.3d at 252. And the "ordinary incidents of prison life" are determined by a baseline represented by the conditions of the prison population to which the inmate was originally sentenced. *See Incumaa*, 791 F.3d at 527.

Finally, in determining whether the conditions of confinement to which the prisoner was transferred were "harsh and atypical," we consider three factors: "(1) the magnitude of confinement restriction; (2) whether the administrative segregation is for an indefinite period; and (3) whether assignment to administrative segregation had any collateral consequences on the inmate's sentence." *Incumaa*, 791 F.3d at 530. Any one of these factors "standing alone might not be sufficient to create a liberty interest," or alternatively,

to show a lack of one. *Wilkinson*, 545 U.S. at 224. Instead, all factors should be considered "together" when making the determination. *Id.*; *see also Smith*, 964 F.3d at 269.

With these requirements in mind, we turn to Cartagena's allegations. As to the first factor, relating to the magnitude of confinement restrictions, the conditions he pleaded in his complaint may weigh in favor of finding them "atypical and harsh." He alleged that he was locked down in a cell 21 hours a day, that recreation took place in a cage, and that contact with the outside world and other inmates was limited. In addition, he alleged that he was subject to strip searches when he left his cell. While such restrictions fall somewhat short in magnitude when compared to those described in *Wilkinson*, *Thorpe*, and *Incumaa* — cases in which a cognizable liberty interest was found — this factor might nonetheless be satisfied, given that Cartagena has alleged conditions comparable to those described in those cases.

But the other two factors strongly weigh against finding a liberty interest. As to the second, Cartagena's placement in restrictive conditions was not "indefinite." While he alleged that he spent 18 months in the SDT Program, he acknowledged that the conditions of his confinement could be relaxed as time passed and that this was dependent on his own conduct. In other words, he held the keys to the conditions of his confinement, and had he complied with the treatment program prescribed for his mental illness, he would have progressed to less restrictive ones. As he alleged, "In order to be free from isolation in [the SDT Program], I was forced to complete programming" and "had to comply with treatment recommendations." Moreover, the overall term of confinement here was far briefer than the 20-plus year duration of solitary confinement that we held amounted to "indefiniteness"

17

in *Thorpe* and *Incumaa*. *See Thorpe*, 37 F.4th 931 ("prisoners [were] living in long-term solitary confinement — some as long as 24 years"); *Incumaa*, 791 F.3d at 531 (addressing "an exceptional 20–year stint in highly restrictive solitary confinement"); *see also Wilkinson*, 545 U.S. at 214–15 ("placement . . . [was] for an indefinite period of time, limited only by an inmate's sentence").

And as to the third factor, whether assignment to the SDT Program had collateral consequences, Cartagena's own grievances underscore that there were none. He alleged that collateral consequences *could arise only if* he failed to comply with his mental health treatment plan. Therefore, any collateral consequences were firmly within his control. As his complaint alleged, "[I]f I failed to cooperate, participate or not complete [the SDT Program's] mental health treatment . . . I am disciplined via 1 – Institutional Infractions [and] 2 – penalized and suspended of good time earnings."

At bottom, we conclude that Cartagena failed adequately to allege a cognizable liberty interest in his placement in the SDT Program. And because he failed to plead a liberty interest, the Due Process Clause requires no process related to his placement in the Program. Accordingly, we affirm the district court's dismissal of his Fourteenth Amendment claim.

## IV

Finally, Cartagena contends that VDOC officials discriminated against him because of his mental illness by assigning him to the SDT Program, thereby denying him the benefits of being housed in the general prison population, including, as he argues in his

brief, participation in the prison work program, in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq*., and the Rehabilitation Act (RA), 29 U.S.C. § 701 *et seq*.  He argues that his mental illness would not disqualify him from housing "in a less restrictive setting," so long as he was given a reasonable accommodation, "such as assistance with medication compliance."  He contends also that, because of his disability, he was denied the "opportunities to interact with his non-disabled peers, participate [in] congregate religious programming" and take part in "other meaningful activities."  He contends therefore that the district court erred in dismissing his discrimination claims.

To seek recovery for violation of either the ADA or the RA, a plaintiff "must allege that (1) she has a disability, (2) she is otherwise qualified to receive the benefits of a public service, program, or activity, and (3) she was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of her disability." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005); *see also* 42 U.S.C. § 12132; 29 U.S.C. § 794(a).  And "a plaintiff is 'qualified' if she is 'an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.'"  *Constantine*, 411 F.3d at 498 (quoting 42 U.S.C. § 12131(2)); *see also Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 406 (1979) ("[Under the Rehabilitation Act] [a]n otherwise qualified person is one who is able to meet all of the program's requirements in spite of his handicap").

19

Cartagena's argument that he was so qualified fails to take account of the facts contained in his complaint, in which he acknowledged that he was assigned to the SDT Program not only because of his serious mental illness but also because he was determined to be "assaultive, disruptive, and/or unmanageable." He was told repeatedly, as noted in his complaint, that one reason that he was referred to the Program was "due to [his] inability to function in [the] G[eneral] P[opulation]" and "because [he] [met] the criteria" of the SDT Program. Indeed, VDOC procedures did not permit transfer to the SDT Program unless the inmate *both* was "classified as Seriously Mentally Ill" and "frequently engage[d] in assaultive, disruptive, and/or unmanageable behaviors." Operating Procedure 730.3, at 2, 7 (eff. Mar. 1, 2018). In short, Cartagena's complaint demonstrates that he was not "qualified" to remain in the general prison population. *See Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1265 (4th Cir. 1995) ("[A]n individual is not otherwise qualified if he poses a significant risk to the health or safety of others by virtue of the disability that cannot be eliminated by reasonable accommodation"); *see also Palmer v. Cir. Ct. of Cook Cnty., Ill.*, 117 F.3d 351, 352 (7th Cir. 1997) (finding that, because the ADA "protects only 'qualified' employees . . . and threatening other employees disqualifies one," the employer did not violate the ADA when it fired an employee who "threatened to kill another employee" as the result of "her mental illness"). For this reason alone, Cartagena failed plausibly to allege that he was "otherwise qualified" for the benefits that he seeks and therefore to state a claim for discrimination. *See Doe*, 50 F.3d at 1267.

Cartagena relies on *Fauconier v. Clarke*, 966 F.3d 265 (4th Cir. 2020), to argue otherwise, but such reliance is misplaced. In *Fauconier*, we held that an inmate had

20

adequately pleaded that he was "otherwise qualified to participate in [a] prison work program" where the complaint included allegations that he had "worked at numerous jobs . . . and did them well," that after "prior hospitalizations, he had always been allowed to return to his then-current job, which he performed competently," and that he "remained well able to perform the job that he had been performing" after the hospitalization at issue that had resulted in his termination from the prison work program. 966 F.3d at 277. In short, the facts there established that the plaintiff was qualified for the prison work program. *Id.* The complaint here, however, alleges the exact opposite — that Cartagena was not qualified for the general population because he was unable to function in it.

Quite apart from these shortfalls in Cartagena's complaint, it must also be noted that Cartagena refused the reasonable accommodation — treatment of his mental illness — that would have expedited his return to the general prison population. This also undoubtedly precludes his present claims. Neither the ADA nor the RA supports a claim for discrimination when the plaintiff rebukes the very accommodations tailored to move him out of the restrictive housing of which he complains.

Accordingly, we affirm the district court's dismissal of Cartagena's discrimination claims.

*     *     *

The judgment of the district court is therefore

AFFIRMED.

THACKER, Circuit Judge, dissenting:

The majority concludes that Angel Cartagena's pro se complaint fails to state a claim. But in my view, the majority misreads and fails to liberally construe the Amended Complaint, and it misapplies the pleading standard. Because I would hold that Cartagena has sufficiently stated a claim at this stage, I dissent.

## I.

At the times relevant to this appeal, Cartagena was housed at the VDOC's River North Correctional Center ("River North") in the Secure Diversionary Treatment Program ("SDTP"). As the majority explains, the SDTP is intended to serve as a treatment program in a "secure setting" for seriously mentally ill offenders who "frequently engage in assaultive, disruptive, and/or unmanageable behaviors." VDOC Operating Procedure 730.3, at 7 (eff. Mar. 1, 2018).

Cartagena alleges in his Amended Complaint that he is seriously mentally ill -- he has numerous diagnoses including schizophrenia, bipolar II disorder, borderline personality disorder, and schizoaffective disorder. And Cartagena alleges the VDOC was aware of his conditions and appropriately classified him as a seriously mentally ill offender.

In addition to its treatment protocols, Cartagena's Amended Complaint alleges that the SDTP is highly restrictive, imposing conditions akin to solitary confinement. Specifically, Cartagena alleges he was subject to the restrictions listed below during his time in the SDTP.

- He was locked in his cell alone for at least 21 hours per day.
- He had to undergo a full strip search any time he exited his cell.

22

- If he was out of his cell, he was placed in handcuffs "with a dog leash attached to them," shackled, and escorted by two officers. J.A. 66.[1]
- When provided, outdoor recreation was in "segregation recreation cages." J.A. 66–67.
- For any provided out of cell programming, he was shackled to a secure chair.
- He was limited to four phone calls per month.
- He was not allowed to own personal property.
- He was prohibited from attending religious services.
- He was not allowed to have a job.
- He was not permitted to be "anywhere near other offenders outside the SDTP." J.A. 67.
- Failure to participate in programming in the SDTP would result in sanctions such as infractions, loss or suspension of good time credits, being held in "segregation" within the SDTP, and being denied privileges offered to others. J.A. 81.

Cartagena alleges that he was held in these conditions for just over 18 months.

While in the SDTP, Cartagena filed multiple informal complaints and regular grievances informing staff[2] at River North that he was suffering "severely from emotional distress" as a result of the restrictions in the SDTP and asking to be moved to a less restrictive unit. J.A. 56; *see also* J.A. 29, 41, 46–47, 49–50. River North often responded that Cartagena's grievances were untimely because they were filed more than 30 days after his transfer to the SDTP. *See* J.A. 31, 34, 37, 42, 48, 58. At other times, when Cartagena included complaints to Appellee Lovell, VODC's director of the SDTP, River North responded by checking the box indicating this "[d]oes not affect you personally," and writing that "Issue[s] with [Lovell] cannot be addressed by [River North]." J.A. 51, 58.

---

[1] Citations to the J.A. refer to the Joint Appendix filed by the parties in this appeal.

[2] Cartagena's various grievances were directed to the Multi-Institutional Treatment Team ("MITT"), which was responsible for recommending assignments to the SDT Program; Appellee Dowell; Appellee Haynes; and Appellee Lovell. Appellee Kilbourne, a member of the MITT, responded to some of the grievances.

When River North did respond substantively, it indicated that "The [SDTP] is designed with [seriously mentally ill] offenders in mind. Offenders are placed in the [SDTP] because they meet the criteria for Serious Mental Illness and they often engage in assaultive, disruptive, and/or unmanageable behaviors." J.A. 29. Other responses included the following: "Offenders are placed in the [SDTP] because they meet the criteria for Serious Mental Illness," J.A. 35; "These bed assignments are designated for offenders who have been classified as [Seriously Mentally Ill]," J.A. 40; and "You have been assigned to the program because you meet the criteria and are a Seriously Mentally Ill (SMI) offender," J.A. 49.

Though the Amended Complaint does acknowledge that the SDTP is intended to be a treatment program, Cartagena claims that he was held in the program against his will and without due process. And contrary to the majority's assertion, Cartagena's Amended Complaint does not concede that Cartagena "refused to comply with the treatment regimen prescribed for him." *Supra*, at 3. Rather, the Amended Complaint alleges that Cartagena was "placed involuntarily" and "detained unlawfully against his will" in the SDTP, and that he was "denied the opportunity to *not participate* in mental health treatment, care, and services." J.A. 64 (emphasis supplied). Moreover, in the grievances Cartagena attached to the Amended Complaint, he wrote that he "was forced against [his] will to comply because if [he] didn't [he] would be forced to remain under isolation in the [SDTP] indefinitely." J.A. 30; *see also* J.A. 35 ("I was forcibly placed in the [SDTP and] . . . forced to comply with '(treatment)' against my own will."); J.A. 36 (same); J.A. 39 ("In order to be free from isolation . . . I was forced to complete programming.").

24

As the majority explained, Cartagena was held in the SDTP until he attempted suicide and was ultimately committed to a medical correctional treatment center.

## II.

We review the grant of a motion to dismiss for failure to state a claim de novo. *Benjamin v. Sparks*, 986 F.3d 332, 351 (4th Cir. 2021). Importantly, at this stage of the litigation, we "assum[e] as true the complaint's factual allegations and we construe all reasonable inferences in favor of [Cartagena]." *Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*, 80 F.4th 466, 472 (4th Cir. 2023) (internal quotation marks omitted).

Because Cartagena's Amended Complaint is pro se, it must be liberally construed. "[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers . . . ." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). Further, "liberal construction of pleadings is particularly appropriate where, as here, there is a Pro se complaint raising civil rights issues." *Loe v. Armistead*, 582 F.2d 1291, 1295 (4th Cir. 1978) (citing *Haines v. Kerner*, 404 U.S. 519, 521 (1972)).

## III.

In my view, the majority misreads the Amended Complaint and fails to properly apply the liberal pleading standard in concluding that Cartagena failed to state a claim.

## A.

As to Cartagena's Eighth Amendment claim, the majority reaches the radical conclusion that Cartagena "cannot satisfy the mens rea requirement because the VDOC officials undisputedly offered Cartagena treatment to help him and protect other inmates,

but he refused it." *Supra*, at 11.  In other words, the majority rests its holding on the false premise that Cartagena refused to comply with treatment in the SDTP.  Then, with that faulty premise in hand, the majority posits that because prison officials placed Cartagena in a treatment program that provided a means by which Cartagena could progress to fewer restrictions, Appellees *could not have been* deliberately indifferent to any risk of harm -- even when Cartagena told them multiple times that the conditions *were*, in fact, creating such a risk.  This view is unsupported in both fact and law.  I am concerned not only about the present case, but also that the path the majority takes could limit the availability of Eighth Amendment conditions of confinement claims in the future.

First, the majority's proposition that Cartagena was offered treatment but "refused it" is belied by the record.  As explained above, Cartagena's Amended Complaint does not concede that he failed to comply with treatment.  Quite the opposite.  Cartagena did not refuse or fail to comply with treatment.  He complied, albeit against his will.  Cartagena wrote that he was "denied the opportunity to *not participate* in mental health treatment, care, and services," J.A. 64 (emphasis supplied), and Cartagena stated multiple times in his grievances that he "was forced against [his] will to comply [with treatment] because if [he] didn't [he] would be forced to remain under isolation in the [SDTP] indefinitely," J.A. 30.  Thus, the Amended Complaint provides no support for the majority's determination that Cartagena refused treatment.  And, even if the Amended Complaint was ambiguous on this question, the liberal construction afforded to pro se pleadings and the typical pleading standard which requires us to draw all inferences in Cartagena's favor would both require

that we conclude, at this stage, that Cartagena *did comply* with treatment protocols in the SDTP.  I am troubled by the majority's conclusion otherwise.

Second, and even more troubling, is the majority's holding that Appellees could not have been deliberately indifferent in the circumstances presented here.  "To prove deliberate indifference, plaintiffs must show that 'the official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety.'"  *Scinto v. Scarberry*, 841 F.3d 219, 225 (4th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).  A plaintiff may satisfy this standard through evidence of actual knowledge or by "prov[ing] by circumstantial evidence that a risk was so obvious that it had to have been known."  *Makdessi v. Fields*, 789 F.3d 126, 136 (4th Cir. 2015).  "Put differently, '[a]n obvious risk of harm justifies an inference that a prison official subjectively disregarded a substantial risk of serious harm to the inmate.'"  *Porter v. Clarke*, 923 F.3d 348, 361 (4th Cir. 2019) (quoting *Schaub v. VonWald*, 638 F.3d 905, 915 (8th Cir. 2011)).

The majority does not dispute that Cartagena filed numerous grievances -- addressed to Appellees -- that indicated, in no uncertain terms, that the "serious restrictions" in the SDTP were "putting [him] at high risk of emotional distress and serious mental anguish," J.A. 46; were "extremely deleterious to [his] well being," J.A. 49; and were causing "severe mental anguish and emotional distress," J.A. 41, 47.

The majority similarly does not dispute Cartagena's argument that the risk of harm created by placing a seriously mentally ill offender in solitary confinement-like conditions is sufficiently obvious.  Nor could it.  As we explained in *Porter*, "the extensive scholarly literature describing and quantifying the adverse mental health effects of prolonged solitary

confinement that has emerged in recent years provides circumstantial evidence that the risk of such harm 'was so obvious that it had to have been known.'" *Porter*, 923 F.3d at 361 (quoting *Makdessi*, 789 F.3d at 136). Therefore, we noted that "the district court correctly pointed out, '[g]iven [State D]efendants' status as corrections professionals, it would defy logic to suggest that they were unaware of the potential harm that the lack of human interaction on death row could cause.'" *Porter*, 923 F.3d at 361 (alterations in original). And in *Thorpe*, we explained that "[a]s far back as 1890, the Supreme Court recognized that prisoners subjected to such confinement exhibited a 'semi-fatuous condition' and 'violent insanity' and even died by suicide." *Thorpe v. Clarke*, 37 F.4th 926, 936 (4th Cir. 2022). Indeed, we explained that "[m]ore recently, the Court reiterated the severe risks of contemporary solitary-confinement regimes that deprive prisoners of almost all human contact. And [we have] observed that prolonged solitary confinement exacts a heavy psychological toll that often continues to plague an inmate's mind even after he is resocialized." *Id.* (internal quotation marks and citations omitted). Thus, even without Cartagena's evidence of Appellee's actual knowledge of the risks he faced, our precedent makes clear that the risk of harm when seriously mentally ill offenders are placed in solitary confinement-like conditions is sufficiently obvious.

Nor does the majority dispute that Cartagena sufficiently alleges in his Amended Complaint that Appellees did nothing to change those conditions or mitigate the risks, despite receiving his grievances. Instead, the majority holds -- without a single citation or reference to any case -- that Appellees could not have been deliberately indifferent to the risk of harm posed by Cartagena's conditions of confinement because Cartagena "was

given control over the removal of restrictions and the increase of social activity by complying with the Program." *Supra*, at 14.

In other words, the majority is of the view that when prison policy provides that an inmate is able to move out of a restrictive housing unit if the inmate complies with the program, that inmate can never state a claim that prison officials were deliberately indifferent to the risks created by the restrictive conditions. That cannot be right. Excluding inmates who are specifically sentenced to death row or super max facilities, inmates who are placed in administrative or disciplinary restrictive housing always have a way out. That is how it works. As the majority recognized, the program here was intended to provide "the carrot of treatment and benefits and the stick of restriction." *Supra*, at 13. When the inmate complies, the inmate, in theory, gains more privileges. Thus, in most cases, an inmate will have some degree of "control over the removal of restrictions and the increase of social activity by complying with the Program." *Supra*, at 14.

But that cannot be outcome determinative. The Eighth Amendment does not allow prison officials to hold inmates in inhumane conditions or conditions that place the inmate at a sufficiently serious risk of harm. That restriction on state action is not, and cannot be, contingent upon whether the inmate complies with the program. Notably, the majority cites no case that stands for such a proposition.

What is more, Cartagena alleges here that his conditions of confinement did not change *despite* his forced compliance, and despite prison policies that suggest he *should have* gained more privileges through compliance. The majority's holding today that Cartagena cannot state a claim even on the facts alleged will mean that prison officials can

29

always avoid liability for violations of the Eighth Amendment, so long as their policies establish a method by which an inmate could be released from unconstitutional restrictions, regardless of whether the policies are followed.

Because the majority's holding is not supported by law or fact, and sets a dangerous precedent, I am compelled to dissent. I would hold that Cartagena has stated a claim that Appellees violated his Eighth Amendment rights.

B.

Next, the majority concludes that Cartagena failed to state a claim that Appellees violated his Fourteenth Amendment right to due process. "Our analysis of due process entails a two-part inquiry . . . . We first determine whether [Cartagena] had a protectable liberty interest in avoiding security detention." *Thorpe*, 37 F.4th at 941. "We then evaluate whether [Appellees] failed to afford minimally adequate process to protect that liberty interest." *Id.* "[T]o demonstrate a liberty interest meriting procedural due process protection, a prisoner must show (1) denial of 'an interest that can arise either from the Constitution itself or from state laws or policies,' and that (2) 'this denial imposed on him an 'atypical and significant hardship . . . in relation to the ordinary incidents of prison life.'" *Prieto v. Clark*, 780 F.3d 245, (4th Cir. 2015) (quoting *Lovelace v. Lee*, 472 F.3d 174, 202 (4th Cir. 2006)); *see also Incumaa* v. *Stirling*, 791 F.3d 517, 534 (4th Cir. 2015); *Thorpe*, 37 F.4th at 942.

The majority focuses its analysis on the second step. To determine whether the alleged conditions of confinement imposed an "atypical and significant hardship" on the inmate in relation to the ordinary incidents of prison life, here general population, we

consider "(1) the magnitude of confinement restrictions; (2) whether the administrative segregation is for an indefinite period; and (3) whether assignment to administrative segregation had any collateral consequences on the inmate's sentence." *Incumaa*, 791 F.3d at 530 (citing *Wilkinson v. Austin*, 545 U.S. 209 (2005)). Any one of these factors "standing alone might not be sufficient to create a liberty interest," or alternatively, to show a lack of one. *Wilkinson*, 545 U.S. at 224. Nevertheless, our precedent confirms that the first factor -- the magnitude of confinement restrictions -- typically carries the most weight, and an inmate need not demonstrate a collateral consequence to demonstrate a cognizable liberty interest. *See Incumaa*, 791 F.3d at 532 (recognizing liberty interest despite any allegation of collateral consequence).

I agree with the majority that the first factor weighs in Cartagena's favor. I similarly agree with the majority that the second and third factors do not weigh in Cartagena's favor. Nonetheless, I part from the majority as to how I weigh each of the factors.

Specifically, I would weigh the first factor more heavily than does the majority. The conditions Cartagena alleges he was subjected to are at least as harsh as the conditions we found to be sufficient in *Incumaa* and *Thorpe*. Particularly troublesome are Cartagena's allegations that he was confined to his cell for at least 21 hours per day, subjected to a strip search each time he left his cell, and was extremely restricted in his communication with anyone outside the SDTP. As to the second factor, whether the confinement was for an indefinite period, I would conclude that the factor only slightly, as opposed to strongly, weighs against Cartagena. To be sure, Cartagena's 18 month confinement in the SDTP is shorter in duration than the time periods at issue in our prior cases. But, liberally construing

Cartagena's Amended Complaint and the attached documents, Cartagena fairly alleges that he could have been held in the SDTP indefinitely if he failed to comply. *See* J.A. 30 ("I was forced against my will to comply because if I didn't I would be forced to remain under isolation in the [SDTP] indefinitely."). And, despite his alleged compliance, Cartagena's Amended Complaint alleges he was not given more privileges or removed from the SDTP until after his suicide attempt -- after it was almost too late.

Finally, as to the third factor, I agree with the majority that Cartagena did not allege any collateral consequences to his confinement in the SDTP. As the majority notes, any "collateral consequences *could arise only if* [Cartagena] failed to comply with his mental health treatment plan." *Supra*, at 18 (emphasis in original). Because Cartagena *did* comply, his Amended Complaint fails to allege any collateral consequences.

Considering all of the factors together, I would conclude that Cartagena has sufficiently alleged, at this stage, that the conditions to which he was subject were sufficiently harsh and atypical to state a claim.

I would also conclude that Cartagena has sufficiently pled that prison policies established a liberty interest in a due process hearing before confining him to the SDTP. Cartagena's Amended Complaint alleges that VDOC operating procedure 830 applies to SDTP, and that placement is decided by the MITT. In their response brief, Appellees concede that that the first step in placing an inmate in the SDTP is "an Institutional Classification Authority Hearing," which "must be a formal due process hearing, which requires a prior formal notification to the inmate indicating the reason for, purpose of, and possible results of the classification hearing, the inmate's right to be present at the hearing,

and notice of the results . . . and the reason for the decision." Appellee's Response Br. at 6 (quoting VDOC, Operating Procedure 830.1 (2021)).

And I would conclude that Cartagena sufficiently alleged that Appellees "failed to afford minimally adequate process to protect that liberty interest." *Thorpe*, 37 F.4th at 941. As we have explained, "if the Due Process Clause means anything, it requires at least 'that a person in jeopardy of serious loss be given notice of the case against him and opportunity to meet it.'" *Id.* at 944–45 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976)). Here, Cartagena alleges he was placed in the SDTP without Appellees providing him (1) "a judicial due process hearing for involuntary commitment after not giving voluntary consent"; (2) "the notice or right to appeal the detention"; (3) the right to attend, make testimony, defend, or provide witnesses against detention"; or (4) "the opportunity to not participate." J.A. 80–81. In other words, he alleges he was not provided minimally adequate process.

## C.

Finally, the majority concludes that Cartagena fails to state a claim that VDOC officials discriminated against him because of his mental illness by assigning him to the SDTP, in violation of the ADA, 42 U.S.C. § 12101 *et seq*., and the RA, 29 U.S.C. § 701 *et seq*. Though I agree that Cartagena failed to state an RA violation, I would conclude that he has sufficiently alleged a violation of the ADA at this stage. While the two claims are often considered together, as detailed below, their standards differ.

To state a claim pursuant to the ADA or RA, a plaintiff must allege that he (1) has a disability; (2) is otherwise qualified to receive the benefits of a public service, program, or

activity; and (3) was denied the benefits of the service, program, or activity, or was otherwise discriminated against on the basis of his disability. *Nat'l Fed. of the Blind v. Lamone*, 813 F.3d 494, 502–03 (4th Cir. 2016). Appellees do not dispute that Cartagena has a disability or that his placement in the SDTP excluded him from general population and any attendant benefits. But Appellees argue that Cartagena was not "otherwise qualified" for general population, and that he was not removed from general population "by reason of" his disability.

As to the second element, "[a] plaintiff is [otherwise] 'qualified' if []he is 'an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.'" *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005) (quoting 42 U.S.C. § 12131(2)). Cartagena argues on appeal that he sufficiently alleges that he was "otherwise qualified" for a unit less restrictive than the SDTP because he alleges that he was not sentenced to a specialized unit or otherwise restrictive setting and that his "treating professionals recommended treatment in a less restrictive setting," J.A. 75.

But the majority concludes that Cartagena cannot state a claim because he was not otherwise qualified for assignment to the general population because he often engaged in "assaultive, disruptive, and/or unmanageable behaviors." *Supra*, at 20. While that may be true, Cartagena's Amended Complaint alleges that Appellees violated the ADA and RA "by subjecting him to unnecessary isolation when treating professionals recommended treatment in a less restrictive setting" than the SDTP. J.A. 75. Thus, liberally construing

Cartagena's Amended Complaint, I would conclude that he alleges he was otherwise qualified only for a "less restrictive setting" than the SDTP, and that less restrictive setting need not necessarily be general population.

The third element requires Cartagena to allege that he was removed from general population "by reason of" his disability. While the ADA and RA are substantially the same, they do differ slightly, but importantly at this step. We have held that the ADA only requires that a plaintiff demonstrate his disability "was a motivating factor" in the discrimination. *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 470 (4th Cir. 1999). The RA, on the other hand, requires that the discrimination be "solely by reason of" his disability. 29 U.S.C. § 794(a).

Cartagena's Amended Complaint, including the attached exhibits, indicate that Cartagena was placed in the SDTP because he met the criteria *and* was a seriously mentally ill offender. *See* J.A. 29. Therefore, Cartagena's RA claim must fail because he does not allege that his mental illness was the sole reason for his placement in the SDTP. But, liberally construing the Amended Complaint, I would conclude that this allegation is sufficient to state an ADA claim because Cartagena's mental illness was a "motivating factor" in his placement in the SDTP.

IV.

For all of the foregoing reasons, I would conclude that Cartagena's Amended Complaint stated a claim for violations of the Eighth and Fourteenth Amendments, and the ADA.